The defendant was tried on a bill of indictment for the murder of Lacy Brumbles, convicted of murder in the first degree and judgment of death by asphyxiation was pronounced by the court below.
The evidence was to the effect that Lacy Brumbles was killed by defendant. Brumbles had a position with the State as a guard for a chain-gang in Robeson County. He had been sick with a cold and cough and had been at home on that account for several days. On Sunday morning, 5 February, 1939, about 8:30 o'clock, he left his home in a little '29 Ford roadster. He had an officer's badge and pistol in a holster in his belt, which he carried as an officer. He was married three years before and was 35 years old. He went to the State camp, about three miles from Lumberton. Defendant was an Indian and had served a term for manufacturing liquor and was released that Sunday morning. He was a cripple, one leg and one hand partly off. Brumbles arrived at the camp about 8:45; he changed his coat and left in his Ford roadster in the direction of Pembroke. He went to the home of James Hammonds, father of defendant, and told him he had promised to bring Bricey Hammonds home but he had left the camp. Brumbles and the father of Bricey Hammonds went to hunt for defendant, but did not find him and returned to the father's home and found defendant there. He had walked home. Brumbles told defendant he had gone to the camp to take him home but had missed him. They stayed there some half hour and the three went to Pembroke in the roadster. The father got out of the car at a garage and was to be picked up at Son Lowry's filling station. Brumbles and defendant went off and stayed about an hour and picked up the father, who testified for defendant, in part:
"When they came back Bricey looked to me about half foolish, when he drove up he had his head hanging down that way, and my first cousin *Page 69 
says, he told me, `Jim,' he said to me, `Bricey is drunk, you better get in the car with him and go on, the law will get him.' I got in the car and we come on. When I got in on the side that put Bricey in the middle, and he had his head throwed up against my left shoulder. I took him to be drunk. Mr. Brumbles had drunk some, I could smell it on him when me and him were taking the tire off the wheel. . . ." They started to the father's home and the tire to the roadster leaked down. Brumbles got an inner-tube out of the car and was putting it in the tire. The following witnesses for the State testified, in part:
Harvard Chavis: "The automobile was out on the edge of the road, parked to the right-hand side of the road, kinder outside; there was room enough for other cars to pass; this car was headed south. . . . I saw these three men. When I first observed them Mr. Hammonds and Bricey were not doing anything but this other fellow was working on a tire, he was taking it off on account of its going down. I didn't know him at that time. When I walked up I spoke to Bricey and me and him spoke a few words, I asked him when he come home, he told me that morning, and said he was going to stay; said he had just come from the prison camp, he had not been home in four months and he was going to stay when he got there, said he come that morning. Nobody else in the crowd said anything to me right then. I stayed there. Something was said about me helping fix the tire, Bricey was the first one asked me, he said `You better help fix the tire,' I told him I reckon I better get on, it was looking cloudy, I was going to get kindling. This guard, Bricey and his father were there then; I mean the deceased when I say the guard. At the time this conversation took place me and Bricey were in the edge of the road and the guard was over in front of the wheel working on the wheel; me and Bricey were right in front of the car; James Hammonds was around on the other side kinder back of the car like, across the car to where we were standing, he was kinder back behind it like. I stood there about a minute I suppose and tried to decide whether to help them with the tire or not; Bricey acted like he had had a drink and I didn't know what shape this other man was in; he had his coat on at the time and I didn't see no badge or gun and I didn't know who he was. He must have got hot taking the tire off and he taken his coat off, walked around in front of the car and threw it in the seat, and when he threw it in the seat I seen his badge and pistol. His badge was on his shirt or vest under his coat, right along down there (indicating the location on his body), and his pistol was in his holster on his right side hip. So when I seen his pistol and badge I decided it would be all right to help him with the tire. I said, `All right, I think I will help with the tire since the cloud's coming up,' looked pretty gloomy, like he might get wet. I started around to try *Page 70 
to help him as much as I could. He taken the old inner tube out and pitched it in the back of the car and he had another inner tube and put it around in the tire; he was squatted down; he put the tire on the car and when it got around tight James Hammonds was holding the tire like this and this guard had inserted a screw driver on the right-hand side down here over on this side and was trying to insert the other tire tool in there; I was in the center and if he got it in there I was going to push down. We all had hold of the tire, I was on my knees and he was squatted down over here on the right, I was immediately to his left, and James was standing kinder to the running board holding all he could. James was to my left and I was in the middle. Me and James were on our knees and this man he squatted down, kinder short man like. At that time Bricey was standing kinder behind us, behind the guard. While we were kneeling down there and inserted the screw driver to get this other tool down here for me to push it down, I heard a pop and felt the heat side of my head and it kinder deafened me and I jumped up and looked around, Bricey had a pistol in his hand, I seen some smoke around close up and he had a pistol in his hand, and his father he looked at the man first and when he hollered, he said `Bricey you have shot that man,' and I happened to look over there, and there was the man, he had fell on his face kinder against the wheel, bottom of the wheel, the inside rim, he fell with his face kinder down there and the blood was gushing out of his mouth and nose, and when I seen that, kinder dazed me for a few minutes and I stood there and looked at Bricey and he still had the pistol in his hand like this, and his father was coming around me and around him and he come around me and him and went to the road and Bricey hollered to him and said, `Wait, Pa,' and he turned his back to me, and when he did I grabbed him around the waist and arms from behind. I grabbed him and held him for his father to come back and take the pistol away from him, so his father came back and wrung the pistol out of his hand and when he wrung the pistol out of his hand I turned him aloose. When his father got the pistol, he said, `Good Lord, what did you mean by shooting that man?' he told him he hadn't done nothing, to keep his mouth shut; that was what Bricey said to him. When I turned Bricey loose I looked back to see if he had fell over, he didn't have any pistol, it wasn't in his holster, the pistol that was in his holster was gone. The pistol was in his holster when he squatted down to fix the tire. When James got the pistol, James told the boy to go on home and stay until he got there."
Brumbles was taken to Baker Sanatorium in Lumberton. The chief surgeon, Dr. H. M. Baker, removed the bullet: "I have an opinion from my examination, satisfactory to myself as to what caused the death of *Page 71 
Lacy Brumbles; he died as a result of the bullet entering the brain. Brumbles died in my hospital about seven o'clock Sunday night."
The tire was fixed near Inman Bridge. Ed Martin: "Brumbles was down on his knees and hands and his head was against the wheel of the car when we got there; it was the right front wheel. When we got there Warrix and Mr. Herbert Lowry and Harvard Chavis taken him up and I went around and cranked the car up and brought him to Baker Sanatorium. I observed that he was bloody, back of his head, the brains was running out and back of his head the clots of blood in the forehead. I brought him to Baker Sanatorium. . . . When we got back there Herbert Lowry had Bricey under arrest. I talked with the defendant, Bricey Hammonds, and he told me he had not been along that road that day, the road the car was on where we got Brumbles at. Brumbles was living when we found him; he was living when I left Baker Sanatorium. It was after twelve o'clock when Bricey told me he hadn't been along that road that day; just after we got back from bringing the man to the hospital he said, in the presence of Sergeant and myself, he hadn't been along that road that day. At the time we got Brumbles from off the ground there at the car he had his coat off; he had a holster for a pistol; there was nothing in it. I stopped at Harvard Chavis' before I brought this man; the shooting was approximately fifty yards from his house and I went and got the pistol; Harvard Chavis' went in the house and got a pistol and gave it to me. He (Harvard) told me he and Bricey's father, James Hammonds, taken the pistol away from him; said Jim told him to keep the pistol until some officer or other came after it and I went to the house and he delivered the pistol to me. When he turned it over to me I opened it and I saw an empty cartridge in the chamber. The pistol was entirely loaded with the exception of one empty cartridge in the chamber; the rest of them were balls. I then brought the man on down here and when I come back I turned the gun over to Sheriff Wade. . . . I found a hold through the back of his hat. . . . I saw blood and hair on the inside of the hat. I saw the coat that was lying in the Brumbles automobile. . . . When I got back I took Bricey and put him in Sergeant's automobile and I got in the seat in the back and sit with him until we got to the jail, and he said, `I will tell the truth about the thing,' he said, `liquor caused it all.' He said, `I went to Lizzie Lowry's for a 25c drink of whiskey and I went to Alleen Carter's and bought 50c worth of whiskey,' and he said to Sergeant, `that caused all of it.'" It was around twelve o'clock when he got to the scene of the killing. "Bricey Hammonds was sober when we brought him to jail; we brought him to jail around two o'clock, somewhere in the neighborhood of two o'clock, I won't be positive. I had seen Bricey before the shooting; he was sober when I saw him *Page 72 
before the shooting, he was sober the first time I saw him after the shooting. . . . I would say it was around 12:15, something like that, that I saw Bricey. I said the shooting took place around 11:45 and I went out to where this thing happened and carried the injured man to Baker Sanatorium. . . . I saw Bricey Hammonds out at Inman Bridge when Herbert Lowry had him under arrest and I observed him. I saw him talk, I saw him walk. I saw nothing about the defendant that would indicate he was drinking."
Shelbie Warrix corroborated Ed Martin's testimony, and testified, in part: "I could smell whiskey on him but I didn't see him walk anymore. I heard him talk. He said he hadn't done nothing. I asked him what he did it for, he said he hadn't done nothing. I smelled whiskey on him, I wouldn't say he was sober; he didn't act like a drunk man, but I think he had had a drink."
Sergeant F. R. Bell: "I asked him if he ever had any trouble with Mr. Brumbles, and he said `No, sir, Captain Brumbles was the finest man I ever knew in my life, never have had a cross word with him, nor he has never said anything to me out of the way.' I said, `Well, why did you shoot him?' He said, `I haven't done anything, they are just framing up on me.' Bricey did not mention that Mr. Brumbles was to carry him home. While I was sitting there talking with him, he was not drunk, he was what I would call about a third drunk; he talked with pretty good sense; he was not drunk and didn't stagger when he walked; he has a peg leg, and I noticed him very close, he got about mighty well to have just one leg. I smelled the odor of liquor on him and it was stump-hole liquor he was drinking. . . . I saw Bricey Hammonds out at Inman Bridge where this homicide took place. I saw him walk."
Sheriff E. C. Wade: "I testified that at the time I saw the defendant that afternoon that he had been drinking, you could smell liquor on him. . . . I went to the car where Herbert Lowry had this defendant arrested and opened the door — it was a roadster — called Bricey and he got out and walked behind the car and walked down the road, to the other side of the road, and I opened the door and he got in the back with Mr. Bell and Ed Martin. I didn't see him stagger. The only thing I could tell about his condition, I could smell the odor of liquor, I couldn't tell by his actions or walking that he was drunk, but I could smell the odor of whiskey. His appearance, the way he walked, acted and talked, was the same as it is here, except in his talk there, when I asked him two or three different times there, he said he hadn't done anything."
Herbert Lowry: "I noticed this man when I arrested him. I noticed him particularly. The reason I was looking at him was because I *Page 73 
was going to arrest him. When I searched him I smelled whiskey on him but he didn't stagger and I didn't ask him any questions and he didn't talk to me any at all. He didn't stagger from where I arrested him over to the car; I taken him over to the car where the shooting was done and put him in the car, and I didn't talk to him, ask him any questions, and I didn't see that he was drunk, he wasn't staggering about any. I walked with him a half mile or three-quarters. That was probably thirty minutes after the thing happened."
W. F. Bailey: "I saw the defendant this past Sunday when the officers had him up here on the road when he was arrested and observed him. I didn't see anything that would indicated he was drunk. I couldn't tell it. He was sitting in the patrol car with Sergeant Bell and the glass was rolled down and I was as close to him as here to her (indicating about two feet); he was holding his head erect and answering questions Sergeant Bell was asking and he was talking and holding his head erect, sitting erect in the car, didn't have the appearance of a drunk man in the car."
D. W. Biggs: "I am coroner of Robeson County. I saw Bricey Hammonds Sunday evening up near Inman Bridge where the killing took place, he was in an automobile up there. I didn't hear him talk any then, I heard him talk around at the jail later on. I just saw him sitting in an automobile up there. From what I saw I didn't see anything that would indicate that he was drunk."
Bricey Hammonds, the defendant, testified, in part: "James Hammonds is my father; this is my father sitting here. I am a married man, have one child, my wife is sitting over there with the child. I have been on the chain-gang, I was there in October, November and December. I was confined to the county roads before this past Sunday; I was released Sunday morning. I knew Lacy Brumbles; I saw him on this past Sunday, I first saw him at my daddy's house. It was somewhere about ten o'clock or ten-thirty when I first saw him; he was at my daddy's house when I went home. Me and him and my father later went to Pembroke. When he got to Pembroke my daddy got out of the car; he got out at Tyner's garage." He then told about getting the liquor from two parties in Pembroke. "Me and Brumbles then left together and come on back and got up with my daddy; we got up with him there at that garage. Well, after he got there he pushed me over and got in the car or got in over me one, I disremember. I was high and I had sot up with the night man all night long, never even shut my eyes. I remember my daddy getting in the car but I never did remember anything else. I don't know whether we went some other place or not. The next thing I remember was at my daddy's, there in the kitchen laying down across the bed. I don't know how long it was *Page 74 
after that I was arrested. When I come to my right mind, I was coming to my right senses, I was in the Sheriff's car. I don't know anything about the shooting, I was drunk. I never had any ill will against Lacy Brumbles, we were friends. I have been in trouble before, three times. I was convicted three times. The first time, me and some more boys, I was a young fellow along then, small fellow, went off with some boys and stole a talking machine, I was convicted of that, I served sixty days I believe, as far as I can remember. I was convicted the second time, there was a fellow that stole some tires and laid it to me and I had to pull time for it; I was convicted for that crime, I pulled sixty days for that. The last time I was convicted for whiskey, manufacturing whiskey, and that was the sentence I was serving when I was released Sunday. I have never killed a man before in my life, never have killed Bish Chavis. I am twenty-four years old, I think. . . . I never said I had been sent there eight months for killing a man and had served five months and Governor Hoey had paroled me; I heard him say that. I know Clarence Locklear, known him all my life. I don't know whether he is my pastor or not, he has preached in my church, he is a good man. I don't know what he has against me to come in here and tell that on me, he was my witness, I had him subpoenaed to testify for me. I was not drinking then. . . . Clarence Locklear picked me up in Pembroke and carried me to the Inman Bridge and he carried me within 300 yards of my home. I missed Brumbles. When he did see me I was coming up to the house at my daddy's."
The defendant was convicted of murder in the first degree, judgment of death was pronounced on the verdict by the court below. Defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
At the close of the State's evidence and at the close of all the evidence, the defendant in the court below made motions for judgment to dismiss or nonsuit. C. S., 4643. This motion was addressed solely to the charge of murder in the first degree "or by any kind of willful, deliberate and premeditated killing." C. S., 4200. The record discloses "at the close of the evidence the defendant admits the killing." *Page 75 
In S. v. Lawrence, 196 N.C. 562 (564): "On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to the drawn therefrom. `An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt.' S. v. Earp, ante, at p. 166; S. v. Carlson,171 N.C. 818; S. v. Sigmon, 190 N.C. 684. The evidence favorable alone to the State is considered — defendant's evidence is discarded. S. v. Utley, 126 N.C. 997. The competency, admissibility and sufficiency of evidence is for the court to determine, the weight, effect and credibility is for the jury. S. v. Utley, supra; S. v.Blackwelder, 182 N.C. 899."
The first question to be decided on this appeal: Did the court below commit error in overruling the defendant's motion to dismiss as to murder in the first degree? We think not. S. v. Daniel, 139 N.C. 549.
In S. v. Steele, 190 N.C. 506 (511-12), Varser, J., for the court said: "The requirement, in first degree murder, in order to constitute `deliberation and premeditation' does not require any fixed time before hand. These mental processes must be prior to the killing, not simultaneous, `but a moment of thought may be sufficient to form a fixed design to kill.' S. v. Norwood, 115 N.C. 789; S. v. McCormac, 116 N.C. 1033;S. v. Covington, 117 N.C. 834; S. v. Dowden, 118 N.C. 1145, 1153;S. v. Thomas, 118 N.C. 1113, 1123; S. v. Exum, 138 N.C. 599." S. v.Buffkin, 209 N.C. 117 (124); S. v. Bowser, 214 N.C. 249 (253-4); S. v.Burney, 215 N.C. 598.
In North Carolina there is ample authority for the statement that the surrounding circumstances and lack of provocation or sudden passion may be taken into consideration by the jury in determining whether the killing was with premeditation and deliberation. S. v. McCormac, supra, 1033; S. v.Roberson, 150 N.C. 837; S. v. Walker, 173 N.C. 780; S. v. Roderick,175 N.C. 722; S. v. Evans, 198 N.C. 82.
Before the killing the deceased and the defendant seemed to have been friendly. The deceased, with James Hammonds and Harvard Chavis, was fixing the tire to Brumbles' Ford roadster, on account of its going down. The defendant, Bricey Hammonds, when Chavis came up, was standing there and had a conversation with him. He said to Chavis, "You better fix the tire." The deceased took his coat off and walked around in front of the car and threw the coat on the seat. *Page 76 
Chavis saw his badge and pistol. His badge was on his vest and his pistol was in his holster on his right hip. When Chavis saw the pistol and badge he thought it would be all right to help with the tire. Chavis testified, in part: "Me and James were on our knees and this man (deceased) he squatted down, kinder short man like. At that time Bricey was standing kinder behind us, behind the guard. While we were kneeling down there and inserted the screw driver to get this other tool down here for me to push it down, I heard a pop and felt the heat side of my head and it kinder deafened me and I jumped up and looked around, Bricey had a pistol in his hand, I seen some smoke around close up and he had a pistol in his hand, and his father he looked at the man first and when he hollered, he said, `Bricey, you have shot that man,' and I happened to look over there, and there was the man, he had fell on his face kinder against the wheel, bottom of the wheel, the inside rim, he fell with his face kinder down there and the blood was gushing out of his mouth and nose. . . . I grabbed him (Bricey Hammonds) and held him for his father to come back and take the pistol away from him, so his father came back and wrung the pistol out of his hand and when he wrung the pistol out of his hand I turned him a loose. When his father got the pistol he said, `Bricey, good Lord, what did you mean by shooting that man;' he told him he hadn't done nothing, to keep his mouth shut; that was what Bricey said to him." The defendant had slipped the pistol from the holster which was on deceased's right hip, while he was fixing the tire, and shot him in the back of the head.
We think under the authorities cited, this was plenary evidence to be submitted to the jury on malice, premeditation and deliberation. It is well settled that proof of a motive for the homicide is not necessary where the evidence shows an intentional killing with deliberation and premeditation.S. v. Buffkin, supra, 125.
On the attitude of premeditation and deliberation, the action of defendant speaks louder than words. There was enough evidence to be submitted to the jury that he did the awful deed cooly, with malice, premeditation and deliberation. He saw the pistol in the holster on deceased's hip, he thought out and resolved in his mind and planned to get the revolver slyly without the deceased's knowledge. After getting the pistol out of the holster, standing behind him, he fired the pistol into the back of deceased's head and killed him.
Craft v. State, 3 Kansas, 447, relied on by defendant, is not in point. It says: " `. . . nothing in the manner of the killing . . . to indicate that there has been premeditation.'" In this case we have the manner of killing, slyly slipping the pistol from the holster on deceased's hip so that he would not know it, and shooting him from behind in the head. After the fatal act defendant told his father. "He *Page 77 
hadn't done nothing, to keep his mouth shut." Cain, the first murderer, said: "I know not; am I my brother's keeper." The evidence evinces that defendant was prompted by an evil heart, desperately wicked and fatally bent upon mischief.
The second question to be decided on this appeal: Was there error in the charge of the court below as regards drunkenness or intoxication as a defense to the killing? We think not.
The defendant contended he was drunk or intoxicated to such an extent that he could not form any intent to commit the criminal act. The court charges on this aspect, in part: "Drunkenness is no excuse for crime and has often been said, but where a specific intent — and I charge you a specific intent is essential to convict of the crime of murder in the first degree — is essential to the criminality of the act, or there must be premeditation or deliberation or some mental process of the kind, in order to determine the degree of the crime, it is proper to consider the prisoner's mental condition at the time of the alleged offense, so committed; if he was not able for any reason to think out beforehand what he intended to do, and to weigh it and understand the nature and consequence of his act, he could not be held to the same measure of responsibility as one with better faculties and a clearer mind should be. . . . And a person who commits a crime while so drunk as to be incapable of forming a deliberate and premeditated design to kill is not guilty of murder in the first degree. . . . Where a specific intent is essential to constitute crime, the fact of intoxication may negative its existence. Accordingly, since the statute dividing the crime of murder into two degrees and in cases where it becomes necessary, in order to convict an offender of murder in the first degree, to establish that the killing was deliberate and premeditated, these terms contain, as an essential element of the crime of murder, a purpose to kill previously formed after weighing the matter, a mental process, embodying a specific, definite intent, and if it is shown that an offender, charged with such crime, is so drunk that he is utterly unable to form or entertain this essential purpose, he should not be convicted of the higher offense of murder in the first degree. . . . If a person when he is cold sober, forms a deliberate intent to kill a person and after he has formed that intent to kill a person, he then becomes intoxicated and while intoxicated kills a person, the fact that he was intoxicated would not reduce murder in the first degree to murder in the second degree. You understand that, gentlemen? To make such defense available, the evidence must show that at the time of the killing, the prisoner's mind and reason was so completely and utterly incapable of forming a deliberate and premeditated purpose to kill. As the doctrine is one that is dangerous in its application, it is allowed only in very clear cases, *Page 78 
and where the evidence shows that the purpose to kill was deliberately and premeditatedly formed when sober, the imbibing of intoxicants to whatever extent in order to carry out the design will not avail as a defense." Taking the charge as a whole and not disjointedly, we see no error in the charge.
In S. v. Kale, 124 N.C. 816 (819), it is written: "If one voluntarily becomes drunk and kills, without justification, he is guilty of murder. S.v. Wilson, 104 N.C. 868. The test of accountability is the ability of the accused to distinguish right from wrong and that in doing a criminal act he is doing wrong. When killing with a deadly weapon is admitted or proved the law implies malice and the burden of showing the absence of malice is upon the defendant. Drunkenness at the time the crime is committed, nothing else appearing, does not repel malice nor lower the grade of the crime. The law recognizes the dethronement of reason, as an insanity for instance, as an excuse. S. v. Potts, 100 N.C. 457. `Voluntary drunkenness is never an excuse for the commission of a crime.' S. v. Keath, 83 N.C. 626. If one charged with murder has premeditated and deliberately formed the intention to kill and did kill the deceased, when drunk, the offense is not reduced to murder in the second degree. S. v. McDaniel, 115 N.C. 807. Of course the killing and its manner, the intent, intoxication, how it comes about and for what purpose drunkenness takes place, and the like, are questions for the jury under the court's instructions as to the law applicable thereto."
The charge of the court below seems to be taken from S. v. Murphy,157 N.C. 614 (617, 618, 619). S. v. Alston, 210 N.C. 258; S. v. Edwards,211 N.C. 555; S. v. Hawkins, 214 N.C. 326 (333); S. v. Adams, 214 N.C. 501
(505); S. v. Bracy, 215 N.C. 248.
The burden rests upon defendant to prove the defense of drunkenness to the satisfaction of the jury to mitigate the offense. S. v. Bracy, supra, 255, 257.
The defendant contends that the charge was erroneous as there was no evidence that the defendant had formed any intent to kill deceased before he got drunk. Taking the evidence and the charge as a whole, we see no prejudicial or reversible error. We do not think the charge, as a whole, impinged. C. S., 564, and is not so conflicting that it could not be reconciled. In fact, it is favorable to defendant. In the very beginning of the charge of the court below is the following: "I instruct you, gentlemen of the jury, that you have the right under the evidence in this case, to render either one of several verdicts. You may find the defendant guilty of murder in the first degree, guilty of murder in the second degree, guilty of manslaughter, or you may find him not guilty, as you may find the facts to be from the evidence in the case. So your *Page 79 
charge is to say by your verdict whether the prisoner is guilty of murder in the first degree, murder in the second degree, manslaughter, or not guilty. It is a matter solely for you to determine whether he is guilty of the felony and murder whereof he stands indicted and determine the grade or degree of guilt, if any you shall find, or to say by your verdict he is not guilty of either offense charged in the bill of indictment as you may find the evidence shall warrant." The court went on and defined correctly murder in the first and second degrees and manslaughter, malice, intent, reasonable doubt. The law applicable to the facts was carefully given. The contention to the charge as regards testimony of interested persons is untenable. The court charged: "And if, from the testimony, or from it and the other facts and circumstances in the case, the jury believes such witness have sworn the truth, then they are entitled to as full credit as any other witness, and you should give that testimony as much weight as the testimony of a disinterested witness."
From a careful reading and re-reading the charge of the court below, it seems as if the learned judge took unusual pains in trying the case following the law as laid down by this Court and applying the law applicable to the facts.
In the judgment we see no prejudicial or reversible error.
No error.