STATE OF NORTH CAROLINA v. JOSEPH EUGENE SPENCE, AND GLENN O'NEIL WILLIAMS.

(Filed 24 July, 1967.)

1. **Indictment and Warrant § 1—**

   An indictment will not be quashed because of absence of preliminary hearing.

2. **Criminal Law § 98—**

   Motion to sequester witnesses is addressed to the discretion of the trial court, and denial of the motion is not reviewable in the absence of a showing of abuse.

3. **Criminal Law § 29—**

   Defendant's motion that his plea of mental incapacity to plead to the indictment and to conduct a rational defense be determined prior to the trial upon the indictment, is addressed to the discretion of the trial court and is not reviewable in the absence of a showing of abuse.

4. **Jury § 3—**

   In a criminal prosecution it is not error for the court to permit the solicitor to challenge prospective jurors for cause on the ground of conscientious scruples against the infliction of the death penalty.

5. **Same—**

   A juror passed by the State and the defendant, but not impanelled, may be excused by the court in the exercise of its discretion upon suggestion to the court that the juror might be guilty of a crime of moral turpitude disqualifying him.

6. **Indictment and Warrant § 13—**

   Motion for a bill of particulars is addressed to the discretion of the trial court and is not reviewable in the absence of a showing of abuse. G.S. 15-143.

7. **Same; Constitutional Law § 31—**

   A list of prospective witnesses furnished by the solicitor to defendants prior to trial is not technically a bill of particulars, and the fact that the solicitor called two witnesses not listed will not be held for prejudicial error when it appears that the solicitor listed all of the witnesses of which he had knowledge on the date he filed the list, and that defend-

ant was apprised of the name of one of the witness on the *voir dire* examination of the jurors and could have ascertained the purport of such witness' testimony by inquiry, and that the solicitor did not have the name of the other witness until the day before his testimony was offered.

**8. Criminal Law § 75—**

The constitutional safeguards governing the admissibility of confessions do not apply to free and voluntary statements made by defendants to a cellmate in jail, and such statements volunteered to a person unconnected with law enforcement and not in consequence of any interrogation are competent.

**9. Homicide § 17—**

Testimony of statements by defendants to the effect that their unarmed victim begged for his life prior to the fatal shooting is competent upon the question of premeditation and deliberation in showing want of provocation.

**10. Constitutional Law § 31;    Criminal Law § 99—**

The fact that the court and the solicitor confer in the absence of defendants' attorney and decide to exclude evidence highly prejudicial to defendants, could not be prejudicial to defendants.

**11. Constitutional Law § 31—**

The fact that the witness' testimony on the *voir dire* is read to the jury upon the ruling by the court that the testimony is competent, *held* not error in depriving defendants of their right to confrontation when it appears from the record that the witness thereafter testified to the same effect in the presence of the jury.

**12. Criminal Law § 102—**

The court properly stops counsel for defendant from arguing the facts of other cases to the jury.

**13. Same—**

While counsel have wide latitude in their argument to the jury, counsel are not entitled to travel outside the record and argue facts not included in the evidence, and what constitutes improper argument must ordinarily be left to the sound discretion of the trial court.

**14. Same—**

In a capital prosecution, the solicitor is entitled to argue to the jury that the jury should return a verdict that carries mandatory sentence of death. G.S. 15-176.1.

**15. Same—**

The solicitor's improper argument to the jury to the effect that if they did not render a verdict without recommendation of life imprisonment the police department's hands would be tied and that the police would not afford protection to the citizenry, *held* cured by the action of the court in stopping the argument and instructing the jury not to consider it.

**16. Criminal Law § 166—**

Exceptions not set out in appellant's brief or in support of which no argument is stated or authority cited will be taken as abandoned. Rule of Practice in the Supreme Court No. 28.

**17. Criminal Law § 5—**

The test of mental responsibility for crime is the capacity to distinguish between right and wrong at the time and in respect of the matter under investigation.

APPEAL by defendants from *Johnston, J.*, 11 July 1966 Criminal Session of GUILFORD — Greensboro Division.

Criminal prosecution upon two bills of indictment which were consolidated for trial, one charging defendant Spence on 26 February 1966 with murder in the first degree of Alton Artamous Maynard, and the other charging defendant Glenn O'Neil Williams with the same offense.

Plea: Not guilty. Verdict: Joseph Eugene Spence is guilty of murder in the first degree, and Glenn O'Neil Williams is guilty of murder in the first degree. There was no recommendation that the punishment shall be imprisonment for life in the State's prison.

From a judgment of death pronounced by the court against each defendant, each defendant appeals.

*Attorney General T. W. Bruton and Deputy Attorney General Harry W. McGalliard for the State.*

*Jack W. Floyd for Glenn O'Neil Williams, defendant appellant.*

*George W. Gordon for Joseph Eugene Spence, defendant appellant.*

PARKER, C.J. The State's evidence tends to show the following facts: On 4 January 1966 defendant Spence visited the office of Dr. Jerome Rex Eatman in the city of Raleigh. At that time he had in his possession a .38 caliber Smith and Wesson pistol with a stag horn type handle. The pistol contained six bullets, two of which had been fired. Dr. Eatman unloaded it, and placed it and the empty shells in his desk. This pistol was in his possession on the morning of 26 February 1966. About 2:30 in the afternoon of that day defendants Spence and Williams came into the office, and took the pistol and left. He turned the bullets over to Detective Larry Smith of the Raleigh Police Department on 1 March 1966.

About 6 p.m. on 26 February 1966 defendants Spence and Williams entered the men's department in W. T. Grant Company, Lakewood Shopping Center in Durham, and purchased therein certain articles of clothing, including pants, sweaters, and shirts. Mrs. Shirley Lorene Blaylock was employed as a supervisor in the store. She watched the defendants while they were there, because they were drinking and acting "funny." She saw defendant Williams had a pint bottle of vodka, and saw it fall out from under his shirt. The

bottle did not fall all the way to the floor because Spence caught it just as it fell out. After putting on the new clothes they bought in the Grant's store in a rest room there, they entered a Broadway Yellow taxi in the parking center, and departed; Spence carried their old clothing in a bag furnished by the store.

The taxi stopped at a grill located on Old Highway #70 on the outskirts of Durham, and then the taxi proceeded westwardly to Greensboro and stopped at McCuiston's Gulf Service Station at the intersection of Asheboro and Gorrell Streets in Greensboro, arriving there about quarter to eight in the evening. At the service station the taxi driver and both defendants got out of the taxi. Cordice Goins, who is the service station attendant at McCuiston's Gulf Service Station, noticed that there were some holes in the windshield in the taxi in which the taxi driver and Spence and Williams were. After they left, Goins called the police department in Greensboro and reported that there was a Yellow Cab and a cab driver from Durham and two men in the cab and one of them had a gun. He thought they were holding him as a hostage. Defendant Spence asked for the key to the men's rest room, and the taxi driver and defendant Williams went inside the service station with the attendant who was on duty when defendant Spence returned from the rest room. He gave the key to the attendant and as soon as he had done so he left the service station to walk down Gorrell Street, leaving behind him the taxi driver and defendant Williams. After Spence departed from the service station, the taxi driver and defendant Williams remained at the service station for awhile, and then the taxi driver and defendant Williams in the taxi proceeded down Gorrell Street in the same direction which Spence had walked.

On 26 February 1966 Homer Diggs was a taxi driver for United Taxi Company in the city of Greensboro. Between 8:10 and 8:20 p.m. on 26 February 1966 he was in the vicinity of Martin and Gorrell Streets. He kept straight across Gorrell Street on Martin Street and just as he was passing the office he detected an out-of-town taxi sitting beside their office, somewhat down from the office on the right-hand side of the street. The taxicab was parked. Just as he approached the taxi, he detected three white males sitting in the cab. One white male was sitting on the front seat beside the driver, and the other was sitting behind the driver, directly behind the driver. The meter seemed to be in an earning position. There was a light on the meter with an "R" on it. The next time he saw this cab was on the same night in the 800 block of Bellevue Street. There were a lot of Homicide Squad policemen and a lot of spectators around it, and the area was roped off when he arrived. This was pretty close to 10 p.m. The taxicab was yellow in color.

About 8:50 p.m. on 26 February 1966 Lilly Ann Thompson and Earline Gainey went to 830 Bellevue to get a hot plate. About four houses from 830 Bellevue Street they saw a yellow cab with a person in the driver's seat with his head lying up against the window. The motor was running, and the taxicab was parked. The windshield had several holes in it. They went home and told Earline's sister, Ola Gainey, that they had seen the taxicab with holes in the windshield. About 15 minutes later the taxicab was still there, and she went up to it. She looked in it and all the windows were up, and the man did not look around. She saw blood running out of his mouth. She called the police.

About 8:50 p.m. on 26 February 1966 Dr. Allen B. Coggeshall, a practicing physician in Greensboro, was called by the Greensboro Police Department, and informed that there was a dead man in a taxicab in the 800 block of Bellevue Street. When he arrived there was quite a large crowd there and numerous police on the scene. The door on the driver's side was opened so that he could get a better view. He saw in it a small brunette man with blood on his face and clothes, lying with the left side of his head over towards the door. A cursory examination showed that he had been shot in the right side of the head and that he was dead. He suggested that the body be removed to the morgue at the Wesley Long Hospital in Greensboro, where it could be examined more carefully, and that was done. An examination at the morgue showed that he had two bullet holes in his head approximately the size of a .38 caliber pistol bullet. One wound was in the right side of the head with the bullet going down through the ear lobe right directly into the bone there, and the other wound on the top of his head admitted a .38 caliber bullet from the officer's belt as they held one in the right side. The bullet from the side appeared to be going directly transverse from this side over towards the left ear. The body was identtified as that of Alton Artamous Maynard. He drove a Yellow taxicab in Durham.

A Carolina Trailways bus left Greensboro about 9:35 p.m., and defendants Spence and Williams purchased tickets to Raleigh, and boarded the bus. They got off the bus in Burlington and the bus left without them.

Thomas Franklin on the night of 26 February 1966 had an old model Chevrolet, License No. B-5780, parked on Maple Avenue in Burlington. It was parked about 50 yards from the bus station. That night the car was stolen. About 3 a.m. on the same night the police department in Raleigh called his house. The next day he went to Raleigh and saw his automobile.

Defendants Spence and Williams were arrested at the Chic Chic Grill about 1 a.m. on 27 February 1966 by the Raleigh Police De-

partment for the larceny of an automobile. Williams had in his possession about $156 in money and some change. The defendants were later turned over to Guilford County upon a capias for their arrest upon a charge of murdering Alton Artamous Maynard, the taxicab driver.

Elbert Spencer Smith, a man with a long criminal record, on 2 March 1966 was in the jail of Guilford County. On that day defendants Spence and Williams were put in the cell he was occupying. Only three of them were in the cell. Williams and Spence engaged in many conversations on the first night and every night afterwards. Williams talked freely the first night. Spence talked very little. On the night of 2 March 1966 Williams said in substance: They left the hospital about noon on 26 February 1966, went to a doctor's office, and stole a pistol that Spence had previously left with the doctor; that they left the doctor's office and stole a Comet automobile; they proceeded to a place north of Raleigh, and drove into a filling station. Williams got out of the automobile and went into the service station and robbed a man there of about $300. He held the pistol on this man and forced him to get in the car with Spence driving. A short distance up the road they pulled the car to the side of the road, and put the man out and told him to run, and as he ran, they fired two shots at him. They then decided to go to Durham. On the way to Durham they picked up a hitchhiker and rode into a small town. They let the hitchhiker out, and went into a store and bought cartridges for the pistol. Leaving there, they decided they had better get rid of the Comet, because the station attendant would possibly be turning them in to the law, and the law would be looking for that automobile. Then he and Spence went to a shopping center in Durham, purchased clothes, and then they got into a taxicab at the shopping center and hired the driver to bring them to Greensboro. Shortly after he left Durham, Williams threw out a bag of clothing. Then during the ride he shot through the windshield several times. They proceeded on to Greensboro and stopped at a filling station. Something was said about going to a rest room at the service station, and someone appeared, and they got a little nervous about the situation because the attendant asked them something about the windshield being shot out, and then they left the station. From there they pulled onto a street and decided to kill the driver. As he was getting out of the left rear door in the taxi, he fired a shot into the head of the driver, and the driver fell against the left door into the door glass. He asked Williams if the man knew he was going to shoot him. Williams said he must have known it because he was begging for his life; he said, "Don't kill me. Put me out in the country, turn me loose anywhere. Just take the cab

and go on but spare my life. I have a wife and children." They shot him anyway. Before walking down the street, he tossed the gun into the front seat where Spence was sitting. Spence placed the gun against the driver's right ear, and fired a shot in the driver's ear, and then he joined Williams a short ways down the street. Williams took the pistol from Spence and used both hands to wipe the hand prints off with his T-shirt. A short distance away he deposited the gun in a sewer. They went to the bus station and purchased tickets to Raleigh. They got off the bus in Burlington and stole an old model Chevrolet and proceeded to Raleigh. The first time he heard any mention of the gun being put in the sewer was on the second night. They did not tell about the sewer on the first night. Thereafter, Spence became a little more talkative. Many times later they both told him the same story. On redirect examination, Smith testified in substance as follows: They did most of their talking at night. Sometimes they were up all night and slept in the daytime. Three or four nights later he was very tired and nervous and he had heard this story many, many times, and he asked Williams one night how it felt to kill a man, and he said, "There's nothing to it." Then he said, "Well, now that you have killed a man, would you do it again?" He said, "Yes, I'd do it again." Spence was lying on his bunk face down with a book of crossword puzzles, working the puzzles, which he did many nights, and he looked back over his shoulder to where they were sitting about six or eight feet away, and he stated, "Yes, I'd do it again." Williams never at any time told him that he could not remember some of the events of February 26, although he stated at one time that his memory was not clear about some of the things that happened that day.

Grover F. Minor, a policeman in the city of Greensboro, conducted certain searches in the area where the Yellow cab was located on the 800 block of Bellevue. On 1 March 1966 about 1:20 p.m. he lifted the lid from a storm sewer at the corner of Bragg and Arlington Streets and observed a pistol and one cartridge in the storm sewer. The pistol was a .38 caliber Smith and Wesson, and was eventually turned over to Sergeant Thomas of the Greensboro Police Department. Dr. Jerome Rex Eatman was shown this pistol by Sergeant Thomas of the Greensboro Police Department, and Dr. Eatman testified in substance that it was similar in size and shape and general over-all appearance to the pistol Spence had left with him, but he cannot positively say that it is the same pistol.

Joseph Samuel Christopher is a truck driver for Pilot Freight Carriers. On 26 February 1966 he left Durham going towards Greensboro. He saw a large paper sack lying on the side of the road between the guard rail and the road, with something red sticking out

of it. He went around and picked it up, and it turned out to be two sweaters and two pairs of pants. He picked up the package and put it in his truck to carry to a little boy he knows that goes to the same church he goes to. About an hour later he was caught for speeding just before he got into High Point. He gave the package of clothes to Trooper Strong who had apprehended him. He put his initials on the clothes. The paper bag containing these clothes was identified by Frank Ray Dombroski, manager of W. T. Grant Company in the Lakewood Shopping Center in Durham. He testified when defendants purchased new clothes from his store in Durham on 26 February 1966, he gave them a bag of this type to put their old clothes in. Defendants went into the men's rest room, took off their old clothes, and put on their new outfits, and came out wearing them.

Defendant Spence introduced evidence tending to show the following facts: He lives in Raleigh. In August or September 1965 he went to see Dr. Jerome Rex Eatman stating that his drinking problem resulted in getting him into trouble with the legal authorities, and on occasions of excessive drinking he would end up in other cities with no recollection of having gone there. He expressed fear to Dr. Eatman of what he might do while in a state of intoxication, and was afraid he might do something to injure himself or someone else. In September 1965 he went to the Wake County Mental Health Clinic in Raleigh and stated to Dr. James Nunnally, III, that he needed advice and help. He told Dr. Nunnally that he had a drinking problem and that when he drank he did not recall what he had done. On 4 January 1966 he went to see Dr. Eatman and had a pistol with him. On this occasion he had been drinking and expressed the fear he might commit suicide or hurt someone including Dr. Eatman. Dr. Eatman made arrangements for him to enter Dorothea Dix Hospital. He entered Dorothea Dix Hospital on 6 January 1966. He stated to the officials there that when he drank excessively he would get into trouble and did not remember what he did. He expressed fear of what he might do and that he had entertained suicidal thoughts, and that he came to the hospital to find out why he does things he does. On 11 February 1966 he was given an electroencephalogram. About 1 or 2 p.m. on 26 February 1966 defendant Spence started consuming alcoholic beverages and mellaril tablets on the premises of the hospital with defendant Williams, who entered the hospital on 7 February 1966 for treatment of essentially the same problems as defendant Spence. After consuming alcoholic beverages on the premises and taking pills, the defendants left the hospital and during the afternoon hours the defendants continued to consume alcoholic beverages and engaged in various and sundry

criminal acts during the itinerary starting in Raleigh and covering several counties.

Defendant Spence offered the testimony of six witnesses, five of whom were doctors, and defendant Williams offered the testimony of eight witnesses. Neither defendant Spence nor defendant Williams testified in his own behalf.

Defendant Williams offered evidence tending to show the following: On 7 February 1966 he was admitted to Dorothea Dix Hospital. Admission summary of the hospital stated that he was unable to control his drinking and that the reason he came to the hospital was the fear that he might kill someone. During his course at Dorothea Dix Hospital, defendant was administered the drug dilantin, an anti-convulsant having the same physical effect as alcohol, and submitted to an electroencephalogram test to determine whether or not he suffered from epilepsy. The result of the test was normal. The final diagnosis of the hospital staff was "anti-social reaction." In the morning hours of 26 February 1966, in company with defendant Spence defendant Williams obtained two pint bottles of vodka which were consumed on the grounds of Dorothea Dix Hospital. His regular dosage of dilantin was administered to him on the morning of that day. Shortly after noon on that day they left the hospital grounds without authority, and continued drinking and taking pills.

Both defendants were represented by court-appointed counsel. Counsel for Spence filed for him a 47 page brief. Counsel for Williams filed for him a 49 page brief.

The record contains 406 pages and 268 exceptions. Defendants have 81 assignments of error.

Defendant Williams assigns as error the denial of his motion to quash the indictment and remove this case to municipal-county court for a preliminary hearing. This assignment of error is overruled upon authority of S. v. Hargett, 255 N.C. 412, 121 S.E. 2d 589; S. v. Overman, 269 N.C. 453, 153 S.E. 2d 44.

Both defendants assign as error the overruling of their motion for sequestration of the State's witnesses. This was in the trial court's discretion and no abuse of discretion has been shown. This assignment of error is overruled upon authority of S. v. Spencer, 239 N.C. 604, 80 S.E. 2d 670; S. v. Love, 269 N.C. 691, 153 S.E. 2d 381.

Defendant Williams assigns as error the overruling of his motion for a bifurcated trial in order that the issues of law of an unlawful homicide and insanity might be tried by different juries. This was a matter within the discretion of the trial judge, and the exercise of that discretion is not reviewable unless there appears that there has been an abuse of the discretion. No abuse appears here. This as-

signment of error is overruled. *S. v. Sullivan,* 229 N.C. 251, 49 S.E. 2d 458.

Defendant Williams assigns as error that the court permitted the solicitor to challenge for cause 79 jurors because they had conscientious scruples against the infliction of the death penalty. This assignment of error is overruled upon authority of *S. v. Childs,* 269 N.C. 307, 152 S.E. 2d 453; *S. v. Bumpers,* 270 N.C. 521, 155 S.E. 2d 173.

Defendant Williams assigns as error the court's excusing in its discretion the juror, Charlie Hairston, who had been passed as a juror by the State and the defendant Spence, but had not been impanelled. The court excused him upon a statement made by the solicitor for the State to him in the presence of counsel for the defendants, and not in the hearing of the prospective jurors, as follows:

> ". . . (T)hat this man was living with another man's wife, and that the man was so concerned about it that he and his family had gotten rather upset about it, that they had knowledge of that, that after the man went to his reward and that this juror, or this prospective juror, was a prime suspect, but they never could gather enough evidence in the thing, and it was one of those things that remains on the books today as unsolved."

No prejudice to the defendant Williams has been shown. The court was correct in exercising its discretion in such a case. This assignment of error is overruled.

Defendants assign as error the denial of their motion for a bill of particulars. This is said in 2 Strong's N. C. Index, Indictment and Warrant, § 13: "Motion for a bill of particulars is addressed to the discretion of the trial court, and is not subject to review except for palpable and gross abuse thereof." In accord, G.S. 15-143; *S. v. Overman, supra.* This assignment of error is overruled. Notwithstanding the denial of the motion, the solicitor did assist the defense attorneys by filing in court several weeks before the trial a list of all contemplated witnesses known to him at that time to be available to the State of North Carolina in the forthcoming trial of these defendants, along with a brief summary of the testimony the State anticipated eliciting from each witness; and the statement further states in substance: It is noted in several instances the specific name was omitted because it was not available to him at the time, but is readily ascertainable to anyone desiring said information, *i.e.,* the Superintendent of Dorothea Dix Hospital. Likewise, it will be noted no proposed facts to be elicited are set forth for the F.B.I. laboratory technicians because copies of their reports have already

been given the attorneys for the defense by the undersigned, along with the Greensboro Police Department's letter of transmittal showing all items of evidence forwarded to the F.B.I. laboratory for examination. Contained on this statement are the names of some 60 witnesses.

Defendants assign as error the court's failure to exclude the testimony of Elbert Spencer Smith and Homer Diggs, for the reason that their names do not appear on the list of prospective witnesses to be furnished to them by the solicitor for the State. This is stated in the brief of defendant Williams' counsel: "In fairness to the able solicitor, on July 11, he revealed Smith's name (but not his evidence) on *voir dire* examination of the jurors in response to an inquiry concerning any additional witnesses. . . . The solicitor stated that he did not have the name of Diggs until the day before his testimony was offered, although the witness had been questioned by the police on February 26, 1966." There is not one iota of evidence that the solicitor was not speaking truthfully when he furnished the list of witnesses to the defendants. As set out above, Smith's evidence was the strongest evidence against the defendants in that it consisted in effect of a statement by each defendant that he was guilty of murdering Alton Artamous Maynard. It is also true that the State's witness Diggs testified, as set forth above, that he saw an out-of-town Yellow cab in the general vicinity where the homicide was committed occupied by three white male persons just before the homicide occurred.

"The function of a bill of particulars is (1) to inform the defense of the specific occurrences intended to be investigated on the trial, and (2) to limit the course of the evidence to the particular scope of the inquiry." *S. v. Lea*, 203 N.C. 13, 164 S.E. 737. It appears clearly from the defendant Williams' brief that during the examination of jurors upon the *voir dire* in this trial, which began 11 July 1966 and ended Saturday morning, 30 July 1966, in which the State used 54 witnesses and Elbert Spencer Smith was the fifty-fourth witness, they had knowledge that the State intended to use as a witness Elbert Spencer Smith. A simple inquiry of the solicitor by defendants' counsel, or either of them, would have shown what Elbert Spencer Smith knew about the case and his long criminal record, and that the only persons present when defendants made their statements of guilt to Smith were defendants and Smith. Defendants' lawyers failed to inquire as to what Smith knew about the case. Neither defendant saw fit to go on the witness stand and deny in whole or in part what Smith testified they said to him. It is hard to see how defendants under the circumstances were prejudiced by the admission of Smith's testimony. We think it is reasonable and fair

that the State should not be held to the narrow limitations of a bill of particulars and adjudicate the legal effect of the information furnished by the solicitor to the defendants to be a bill of particulars, but rather it should be taken for what on its own face it purports to be, nothing more nor less than a statement by the solicitor of witnesses he knew about on the date he filed the list. Taken in that light, the court did not err in not excluding the testimony of Smith and Diggs, and even if the court did err in admitting such testimony, which we do not concede, the testimony under the totality of the circumstances here is not sufficient to warrant a new trial.

Defendants further assign as error the admission of Smith's testimony as to what defendants told him, and particularly as to the taxi driver's begging for his life. It appears manifest that the statements of defendants were free and voluntary. Defendants contend that the principles announced in the case of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, are applicable to this case. We do not agree. That case, expressing the views of five members of the Court, in summary deals with the admissibility of statements obtained from an individual who was subjected to custodial police interrogation and the necessity for procedures which assure that an individual is accorded his privilege against self-incrimination. The Supreme Court of the United States has not, as yet, held that the free and voluntary statements of a defendant to a cell-mate in jail are incompetent. The testimony that the taxi driver begged for his life is thoroughly competent as showing want of provocation for the killing, and it is thoroughly settled that among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are want of provocation on the part of the deceased. *S. v. Matheson,* 225 N.C. 109, 33 S.E. 2d 590; *S. v. Hammonds,* 216 N.C. 67, 3 S.E. 2d 439; *S. v. Buffkin,* 209 N.C. 117, 183 S.E. 543. The assignments of error in respect to the admission in evidence of the testimony of Smith are overruled.

Defendants assign as error this statement of the court appearing on page 257 of the record:

> "I want to make this entry in the record. In the absence of the jury, at some time before the commencement of the introduction of evidence for the State, the Solicitor discussed with the court privately the propriety of certain evidence pertaining to two murder indictments against these same defendants in Granville County and the other evidence which the State proposed to offer in this trial. The discussion led to the conclusion between the court and the State's attorney as to whether the evidence pertaining to these two indictments was competent;

that the evidence which the State otherwise had was such as to render it unnecessary to pursue the evidence with reference to these two indictments and that the end result may be that the only thing to be accomplished would be of such an inflammatory nature that it would be best that the State not use it, and it was agreed by the Solicitor and the court that this line of evidence would not be pursued in developing the State's case. This is inserted in the record to explain the Solicitor stopping this witness at a point when he was relating to the jury certain statements that the defendants made in his presence while they were in the same jail cell in the Guilford County Jail."

The defendant contends that:

"The court erred in conducting a pre-trial conference with the solicitor for the State and not including the defense counsel, during which conference the court and the solicitor agreed in advance as to the admissibility of evidence to be offered for the State."

This assignment of error is overruled. Certainly, it did not prejudice defendants.

Dr. James Nunnally in the absence of the jury testified in substance as follows: It is his opinion that a pathologically intoxicated person can lose contact with reality. At this point the judge stated that he would let the jury hear this line of questioning. The jury then returned to the courtroom and the court permitted the court reporter to read to the jury the questions propounded to the witness by counsel for defendant Williams and the answers of the witness. Defendant Williams assigns this as error. Nothing else appearing, such would constitute error under the holdings in *S. v. Payton*, 255 N.C. 420, 121 S.E. 2d 608; *S. v. Wilson*, 269 N.C. 297, 152 S.E. 2d 223. However, an examination of the record shows that Dr. Nunnally in the presence of the jury in response to questions asked him by counsel for defendant Williams in the absence of the jury, which questions were read to him by the court reporter from her notes, testified at length to the same effect in the presence of the jury. This testimony of Dr. Nunnally was heard by the jury from the lips of the witness himself, and the jury was able to observe his demeanor at the time he testified. In addition, Dr. Nunnally's testimony in the absence of the jury covered about three-fourths of a page. When the jury was recalled to the courtroom, his answers to questions read to him by the court reporter covered over three pages in the record. The last testimony of Dr. Nunnally was this: "In my opinion, there is a point which a person with acute brain syndrome would not be

able to comprehend the nature and consequences of his act." At this point counsel was asked, "Do you have any other questions that you want to ask him at this time?" Counsel for defendant Spence replied, "No, sir." This assignment of error is overruled.

Counsel for defendant Williams in his argument said this:

> ". . . Now, I think this is significant, and this along with the other little inconsistencies, I hope will show you the danger in convicting a man on trial for his life on circumstantial evidence. You are all familiar with the Sacco-Vanzetti trial in New York, where they had an eye witness there and executed a man. It is common literature, and the books are still pouring out because there was a witness who came in and said, 'No, these men - - -' "

Upon objection of the State's counsel, the court stopped his argument in reference to the Sacco-Vanzetti trial. He assigns this as error. Further on, counsel for Williams in his argument made this statement: ". . . Now, the court is going to instruct you as to the law of insanity. He is going to give you what is called the McNaughton [M'Naghten] Test of Insanity. McNaughton [M'Naghten] was. a fellow who shot and killed a prime minister in England." Upon objection, the court said, "Let's stay away from other cases." Counsel for the defendant said, "Will the court not let me give the history of the McNaughton [M'Naghten] Rule?" The court replied, "I won't let you give the facts of the case. That has always been improper, Mr. Floyd." Defendant Williams assigns as error the court's refusing to let him argue the facts of the *Sacco-Vanzetti* case and the history of the M'Naghten Rule. These assignments of error are overruled.

In this jurisdiction wide latitude is given to counsel in the argument of hotly contested cases. Moreover, what constitutes an abuse of this privilege must ordinarily be left to the sound discretion of the trial judge. *S. v. Bowen*, 230 N.C. 710, 55 S.E. 2d 466. Counsel is not entitled to travel outside the record and argue facts not included in the evidence. *S. v. Christopher*, 258 N.C. 249, 128 S.E. 2d 667.

". . . (N)or will counsel be permitted to read cases which tend to distract the attention of the jury from the case in hand without throwing any light upon it. Likewise, the reading of facts for the purpose of prejudicing the jury should not be permitted, as, for example, the reading of facts for the purpose of contrasting them with those of the case at bar." 53 Am. Jur., Trial, § 494. It is apparent from the statement of Mr. Floyd, counsel for defendant Williams, that he was arguing the facts of the *Sacco-Vanzetti* case

not from an appellate court decision but from a book published upon the subject. The court's stopping this improper argument about the *Sacco-Vanzetti* case and about the history of the M'Naghten Rule was correct. These assignments of error are overruled.

Both defendants assign as error the able argument of the solicitor for the State that the jury in this case should find a verdict that carried a mandatory sentence of death. The General Assembly in 1961 enacted Chapter 890 of the Session Laws, codified as G.S. 15-176.1, which reads as follows: "In the trial of capital cases, the solicitor or other counsel appearing for the State may argue to the jury that a sentence of death should be imposed and that the jury should not recommend life imprisonment." In making this argument the solicitor was doing what the statute gave him a positive right to do. In his argument he made this statement:

> "Ladies and gentlemen, to do less than to ask you to return a verdict would be a sin, and if you do less than return that verdict, the only thing that I can say is don't ask the police department — don't ask the Solicitor or anybody else to protect you any more, but stop at the hardware store on your way home, get yourself a couple of locks and put them on your front door and your back door and get yourself a gun and protect yourself because the police department's hands are tied from now on unless you have the courage to do what —"

At that place an objection was lodged to this argument by counsel for defendant Williams, whereupon the court promptly made this reply: "Well, yes, there is no evidence in the record that the police department won't protect anybody. Strike that. Don't consider that part of his argument, members of the jury." The prompt action of the judge cured the error. We have carefully considered the challenged argument of the solicitor. The facts of the brutal murder disclosed by the evidence in this case fully justified the solicitor's argument for a verdict of guilty of first degree murder without a recommendation of imprisonment for life, and he was entitled to make such argument by authority of G.S. 15-176.1. The assignments of error to the arguments made by the solicitor are overruled.

The court in its charge said this to the jury:

> "When insanity, mental disease or disorder, even from long and continued use of alcohol or drugs, is interposed as a defense in a criminal action the burden rests with the defendant to prove such — not beyond a reasonable doubt, nor by the greater weight of the evidence — but only to the satisfaction of the jury."

To this charge the defendants did not except, nor is this extract from the judge's charge set out in the brief of either defendant. The rule is firmly established with us that exceptions in the record not set out in appellant's brief or in support of which no reason or argument is stated or authority cited will be taken as abandoned by him. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 810; *S. v. Little,* 270 N.C. 234, 154 S.E. 2d 61; *S. v. Midyette,* 270 N.C. 229, 154 S.E. 2d 66; *S. v. Barber,* 270 N.C. 222, 154 S.E. 2d 104. In addition, defendants in their written prayers for instructions asked the court to give this charge:

> "If the State has satisfied you beyond a reasonable doubt, as the court has defined that term to you, that the defendants or either of them committed the act charged in the bill of indictment then it would become your duty to consider whether or not the defendants or either of them lacked sufficient mental capacity to form a criminal intent. On the plea of drunkenness as a defense, the burden is on the defendant to satisfy the jury that at the time of the commission of a crime he was intoxicated to such an extent that he did not know what he was doing, or trying to do, and was incapable of forming a criminal intent. However, if a defendant drinks liquor or other intoxicants for the purpose of giving him nerve and courage to commit a crime, then such voluntary drunkenness would not be an excuse for a crime committed while thus intoxicated. *State v. Hairston,* 222 N.C. 455 (1943)."

Defendants assign as error the court's charge in substance that the test of responsibility is the capacity to distinguish between right and wrong at the time and in respect of the matter under investigation. Counsel for defendant Williams contends that we should abandon the M'Naghten Rule and adopt that of the Model Penal Code. We do not agree. This assignment of error is overruled.

In *S. v. Creech, supra,* the Court said, speaking by Stacy, C.J.:

> "The test of responsibility is the capacity to distinguish between right and wrong at the time and in respect of the matter under investigation. *S. v. Potts,* 100 N.C. 457, 6 S.E. 656; *S. v. Brandon,* 53 N.C. 463. He who knows the right and still the wrong pursues is amenable to the criminal law. *S. v. Jenkins,* 208 N.C. 740, 182 S.E. 324. On the other hand, if 'the accused should be in such a state of mental disease as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing wrong,' the law does not

hold him accountable for his acts, for guilt arises from volition, and not from a diseased mind. *S. v. Haywood,* 61 N.C. 376.

"We are aware of the criticism of this standard by some psychiatrists and others. Still, the critics have offered nothing better. It has the merit of being well established, practical and so plain 'that he may run that readeth it.' Hab. 2:2. Moreover, it should be remembered that the criminal law applies equally to all sorts and conditions of people. It ought to be sufficiently clear to be understood by the ordinary citizen."

In *Leland v. Oregon,* 343 U.S. 790, 96 L. Ed. 1302, reh. den. 344 U.S. 848, 97 L. Ed. 659, the Court, speaking by Mr. Justice Clark, said:

". . . Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in *M'Naghten's* Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. . . ."

True it is, that the atrocity of the defendants' conduct in killing Alton Artamous Maynard, an unarmed man, without provocation, was a circumstance from which opposite conclusions were sought to be drawn: the one that it exhibited minds fatally bent on mischief; and the other that it revealed diseased intellects on the part of each defendant caused by each defendant's drinking problems. The jury attributed it to the former.

Manifestly, a *seriatim* discussion of each assignment of error is not necessary or desirable, for to do that we would have to write a book instead of an opinion. We have discussed the basic principles which appellants urge in support of their assignments of error. We have carefully examined each exception and each assignment of error by each defendant. We find nothing in any one of them which in our opinion would justify another trial as to either defendant.

No error.