THE STATE OF OHIO *v.* RAND.

---

[4]This question was submitted to a jury in the lower court and the jury found that the plaintiff had been wrongfully discharged.

[5]In its brief defendant challenges the adequacy of plaintiff's allegation that his discharge was without cause. Although plaintiff never uses the precise words "without cause," we find that the complaint as a whole adequately informed the defendant that an element of plaintiff's cause of action would be that his discharge was without cause.

(No. 37821—Decided May 13, 1969.)

Common Pleas Court of Franklin County.

*Mr. C. Howard Johnson*, prosecuting attorney, *Mr. John E. Peck* and *Mr. M. Claude Sharf*, for plaintiff.
*Mr. John W. E. Bowen* and *Mr. Sol Morton Isaac*, for defendant.

STERN, J. The specific issue raised by this motion is whether the defendant is competent to stand trial, if tranquilizing drugs are administered under proper medical direction, which permit the defendant to communicate with his counsel, in an apparently reasonable and rational manner, as to the preparation and conduct of his defense to the pending charge of murder in the first degree.

In 1960, the defendant was found guilty by a jury of murder in the first degree with the recommendation of

mercy. An appeal was timely filed by court-appointed counsel. The judgment of conviction was reversed by the Court of Appeals of Franklin County on February 28, 1967. Leave to appeal was dismissed by the Supreme Court on September 27, 1967.

The defendant was committed to the Lima State Hospital prior to trial in 1960. He was also a patient at Lima after conviction, upon transfer from the Ohio Penitentiary on January 27, 1961. He remained at Lima until April 1962. In 1963, he was again transferred to Lima from the Ohio Penitentiary by the State Department of Mental Hygiene and Correction, and he has been at Lima until the present time.

On November 29, 1968, a preliminary hearing was held, with the defendant and counsel for the state and defendant being present. A second hearing was held on March 14, 1969, at which time medical testimony was adduced by both parties.

Before discussing the specific issues presented to the court, consideration must be given to the propriety of the detention of the defendant at Lima State Hospital since November 17, 1967, when the Court of Appeals issued its mandate remanding the case to the court for further proceeding.

The defendant was sentenced to the Ohio Penitentiary "for life" on June 20, 1960. The defendant is at the present time under the custody of the warden of the penitentiary. Since the penitentiary is under the jurisdiction of the Department of Mental Hygiene and Correction, the warden has the statutory right to transfer prisoners from one institution to another that is under the jurisdiction of the state corrections department. Section 5119.17, Revised Code. However, when the Court of Appeals issued its mandate reversing the Common Pleas Court judgment of conviction, a certificate of reversal should have been issued to the warden of the penitentiary, and the warden, upon receipt of such certificate, should have caused the defendant to be conveyed to the sheriff of this county to await further legal proceedings. Section 2953.13, Revised Code.

If it was felt that the defendant was not sane after the

Court of Appeals mandate was issued in 1967, proper legal proceedings should have been instituted to have the defendant committed to a mental hospital. This was not done. Therefore, the defendant is being held at the Lima State Hospital without proper judicial commitment.

Turning now to the specific question presented, the court faces an anomalous situation, in that since October 1967, the defendant has asserted, through counsel, that he is competent to stand trial, while the state has taken the opposite view. The question of "insanity" either upon the issue of competence to stand trial, or upon the issue of not being guilty by reason of insanity, is usually a matter raised by the defendant.

Does the state of Ohio have standing to raise the issue as to defendant's competency to stand trial? This issue, competency to stand trial, must be raised and determined before the issues of the actual trial can be heard and decided. Under Section 2945.37, Revised Code, the question of competency to stand trial can be raised orally by the defendant in any manner or by the court itself upon its own motion. The question can be raised by the prosecution. See *Ormsby* v. *United States* (1921), 273 F. 977, 987. The court in that case ruled that a public officer, charged with enforcing the criminal law, is inherently charged with the duty of invoking laws of this character, not only for the protection of society, but also for the protection of those accused of crime. In fact, if it appears to the court itself that the question of competency to stand trial should be considered, the court is duty bound to inquire into said issue, *People* v. *Aparicio* (1952), 38 Cal. 2d 565, 241 P. 2d 221. The issue may be heard and determined even over the objection of defendant's counsel, *State* v. *Hebert* (1937), 186 La. 308, 172 So. 167.

The Ohio statute and court decisions clearly indicate that we are following the common-law rule that if the question of competency to stand trial is raised by the defense, the prosecution, or the court, the matter must be judicially heard and determined before the case may proceed to trial.

We then must consider what is meant by the term

"competency to stand trial." The Supreme Court of Ohio states the test in *State, ex rel.* v. *Bushong* (1946), 146 Ohio St. 271, 273, as:

"A person being of sufficient mind to understand and appreciate the nature of the charge against him, to comprehend the situation and whether he is mentally capable of furnishing his counsel the facts essential to the presentation of the proper defense."

This case followed the position taken by that court in *State, ex rel.* v. *Owen* (1937), 133 Ohio St. 96, 104. This test was also announced in the landmark case of *Dusky* v. *United States* (1962), 362 U. S. 402:

"The test must be whether he (the defendant) has sufficient ability to consult with his lawyer with a reasonable degree of rational as well as factual understanding of the proceedings against him."

The responsibility and duty of the court in making a finding as to mental competency of an accused to stand trial is also very clearly set forth in the well-considered opinion in *Feguer* v. *United States* (1962), 302 F. 2d 214, which holds that the presence of a mental illness does not mean necessarily one is mentally incompetent to stand trial. The fact that defendant Rand, prior to his trial in 1960, raised the defense of not guilty by reason of insanity, and the fact that since 1963, by the direction of state authorities, the defendant was a patient in Lima State Hospital, do not prohibit a court at this time from determining the defendant's competency to stand trial.

The tests of responsibility—capacity to know right from wrong, irresistible impulse, etc., have no bearing on the issue presented in this particular proceeding. *State* v. *Murphy* (1960), 56 Wash, 2d 761, 355 P. 2d 343, 83 A. L. R. 2d 1061, stated the test of mental unsoundness sufficient to permit a person's trial as:

Has the defendant capacity to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings and to make a rational defense?

It is, therefore, clear that the test of insanity, under

the Ohio law as stated by Chief Justice Taft's recent opinion in *State* v. *Staten* (1969), 18 Ohio St. 2d 13, does not pertain to the proceedings at hand.

Relevant testimony adduced at the hearing on March 14, 1969, clearly reveals the opinions of both experts as to the specific issue in this case.

Direct examination of Dr. Alexander Chomyn, Staff Psychiatrist at Lima State Hospital:

"Q. At the time, Doctor, did George Albert Rand display any manifestations of this particular illness?  A. Yes.  He could not get along with other patients without medication.  When he was on medication he was co-operative and a good patient, good worker.

"Q. What kind of medication was he on, sir?  A. Thorazine and Stelazine.

"Q. Doctor, could you—I don't understand the word as a layman, could you explain what Stelazine is?  A. Stelazine is a drug which is employed in the treatment of insanity.

"Q. What is the function of this treatment, Doctor?  A. The patient gets along well with other patients.  He will co-operate but not every patient responds the same way.  Some patients will not respond at all.  We can increase the dosage and so forth.  And the effect is very poor, sometimes.

"Q. Stelazine is a tranquilizing agent?  A. Tranquilizing drug.

"Q. What, then, Doctor, is Thorazine?  A. Thorazine is the same as a tranquilizing drug, and sometimes we use, combined Thorazine and Stelazine when one drug is not effective.

"Q. Can you tell us in a few words what is the purpose of the combined Stelazine and Thorazine therapy?  A. To increase effectiveness of the drug.

"Q. In what way does the combination increase the effectiveness of one or the other, sir?  A. In that way the person gets relaxed, will co-operate and will not get in trouble.

"Q. Is this the way he reacts when he is on this com-

bined Stelazine and Thorazine? A. Yes. Very often he reacts favorably.

"Q. Doctor, would you in your opinion classify this as a light dosage, moderate or heavy dosage? A. Moderate.

"Q. A moderate dosage. Now sir, after this time, well, since that time, what has been your contact with George Albert Rand. A. Then he was transferred to another ward and then another doctor and so on, and finally he was assigned to me in 1968 when he was transferred to my ward.

"Q. I see. Has his medication ever been resumed? A. No, December 2, 1968, his medication was stopped.

"Q. Now Doctor, since his medication was stopped on December the 2nd of 1968, has he started to regress? A. Yes. Prior to stopping medication, he was assigned to clean at least ten rooms, keep them in order, make beds, he was to clean the floor and everything. He was a very good worker, co-operative, nothing wrong with him. Then after his medication was stopped, he started to get too slow in his work performance, and finally he could not do his work in due time. Therefore, another patient was assigned to him as a helper. He could not get along with this other patient, and he quit work altogether and said, 'Will you lock me up?' That means to put him in his own cell. Then, gradually, his mental condition deteriorated. He would not reply to the answers. He will lay day and night on his mattress. He will urinate on the floor. Sometimes he will take food and other times he will not. He will not answer. And his mental condition is very bad. He was a very good patient, co-operative, very good worker when on medication. Without medication he breaks down.

"Q. All right. Now, Dr. Chomyn, has there ever been a diagnosis of Mr. Rand in Lima State Hospital that he was above average in intelligence? A. He had a reasonably high IQ, was polite, co-operative.

"Q. Has there ever been such a diagnosis? A. Yes, when on medication.

"Q. All right. Now, has there ever been a diagnosis along this line by you of this defendant? A. Yes, when he

was on medication he was polite, good worker and smart boy.

"Mr. Bowen: He said that he was aware. All right. Now, Doctor, let's go to the matter of tranquilizing drugs. You referred to them as Stelazine and Thorazine. A. Yes.

"Q. This was given to him, according to your testimony, as a mild dosage, you said, twice a day? A. Not mild. It is mild, medium or large. It was medium.

"Q. In other words, you are saying that—A. 200 milligrams is a medium dosage.

"Q. Are these drugs used in any other place, under any other circumstances except in Lima, at home, the State Hospital? A. Why, many psychiatrists who have private practice, they give patients who are at home and they treat patients privately.

"Q. Why was he taken off, then? A. Why? Because we knew he was to appear in court. And be present as a normal human being can in order to get release. And our statement is that he is insane and should be kept in a hospital for mental ill.

"Q. All right. Now, that is the opinion we are trying to get at. From your testimony, the only reason that tranquilizing drugs were withdrawn from this defendant, even though you knew he should receive them every day, was because of the fact that he was going to appear in court, is that right? A. In order to present him in his real face before the court.

"Q. In his real picture. Let's assume that—would the tranquilizing drugs have any effect upon his ability to think? A. Yes.

"Q. What would this effect be? A. That he acts like a normal human being.

"Q. In other words, he would think clearly? A. In behavior, in talking, in actions.

"Q. In other words, with the tranquilizing drugs he would behave as a normal person? A. Almost like a normal human being. There is no actual signs of active psychosis when he is on medication of tranquilizing drugs.

"Q. Now, with the use of tranquilizing drugs, would

Mr. Rand be able to understand, in your opinion, be able to understand the nature of the charges against him? A. Without drugs?

"Q. With drugs. A. With drugs, yes.

"Q. With drugs. In your opinion, would Mr. Rand be able to counsel in his own defense? A. I assume.

"Q. Counsel with his attorneys in his own defense? A. I may assume yes, because he still gets a little moody, suspicious all the time. Everyone is sometimes suspicious.

"Q. That is the point we all, from time to time, become moody, depressed, suspicious, even sometimes hostile? A. Yes.

"Q. But with the drugs, it is your opinion he would be able to counsel with his lawyers in his own defense? A. Yes."

Direct examination of Dr. Ralph M. Patterson, called by defendant:

"Q. Do you believe, then, from your examination of George Albert Rand on those two occasions that he was— January 1st, was in January—able to assist his counsel in the preparation of a defense to those charges? A. January the 3rd. I found him very logical and thinking clearly and able to, at that time, certainly able to collaborate with the attorney and understanding the proceedings.

"Q. Do you believe there have been changes since that day when you examined him? A. Yes, there have been some changes.

"Q. Do you believe that he is able today to counsel with his counsel in the preparation of his defense? A. I believe he is able to today but less efficient than January 3rd.

"Q. Are you aware of the type of medication that George Albert Rand has been given at Lima State Hospital? A. Yes, I am familiar.

"Q. Can you describe it? A. He has been receiving what we call phenothiazine or was until mid December, '68. Phenothiazines being drugs used previously to influence psychiatric disorders, to influence thinking being a corrective character in their action.

"Q. Are you acquainted with the use of these drugs in your own practice? A. Yes. We use them daily, continuously, and have since '56.

"Q. Do these drugs change or affect the personality of a person. A. They in proper usage influence mental illness for better—if you are asking, do they influence personality in the sense of permitting better thinking, yes.

"Q. Do they affect a person's memory? A. They do not affect memory.

"Q. Did you notice any effect of this residual of medication on January 3rd of George Albert Rand? A. He was thinking well and his thoughts were correctly integrated at that time."

There are a number of decided cases that must be considered to determine the specific issue in this case, *i. e.*, the propriety of the use of tranquilizing drugs to calm a person to a point where he is competent to stand trial under the tests stated in the *Bushong* and *Dusky cases, supra.*

In *People* v. *Rogers* (1957), 150 Cal. App. 2d 403, 309 P. 2d 949, the court held that if the defendant would follow the doctor's orders in taking prescribed medication to keep diabetes under control, the defendant could stand trial.

In *State* v. *Hancock* (1957), 247 Or. 21, 426 P. 2d 872, the defendant had taken, before trial and during the entire trial, tranquilizing drugs, and the fact that the taking of such drugs did not adversely affect his ability to communicate with other people, his memory or his mental function, and that he actively participated in the trial, showed that he was competent to stand trial.

The fact that there may be apprehension that a defendant indicted for murder might be a menace to society if ever released affords no basis for holding the accused to be presently insane and therefore not triable under the indictment, nor for holding an accused in a state mental hospital for the criminal insane without a determination of such issue by due process of law. A person may stand trial if he is presently able to understand the proceedings

against him and to assist in his defense, *State* v. *Swails* (1953), 223 La. 751, 66 So. 2d 796, and *Bushong* and *Dusky, supra.*

One further issue should be noted. In *Commonwealth ex rel. Kennedy* v. *Mingle* (1957), 388 Pa. 54, 130 A. 2d 161, the court ruled that in determining the issue of the administering tranquilizing drugs and their effect on competency to stand trial, the court must take into consideration the nature of the narcotic administered during trial, when and by whom administered and the influence which the narcotic might have had on the defendant during trial.

In the instant case, the defendant took the tranquilizing drugs under the direction and control of medical authorities; he is not attempting to evade the responsibility of standing trial. In fact, since the Supreme Court of Ohio dismissed the appeal following the reversal by the Court of Appeals, he, through his counsel, has been asking that he be brought to trial.

In *Pate* v. *Robinson* (1966), 383 U. S. 375, Mr. Justice Clark's majority opinion indicates that a hearing on competency to stand trial must be held if such issue is presented to the Court, and if it appears to the court that the defendant is competent to stand trial, he should be brought to trial promptly or be discharged.

It is, therefore, the finding and order of this court that:

(1) There is no authority in law to hold the defendant at Lima State Hospital following the reversal of the judgment of conviction and the remanding of the case for trial.

(2) The defendant is competent to stand trial, under properly administered tranquilizing drugs that permit him to counsel with his lawyers, as the test is set forth in the *Bushong* and *Dusky cases, supra.*

(3) The defendant must be brought to trial within sixty days after this order is journalized, or the defendant is to be discharged.

*Judgment accordingly.*