STATE OF NORTH CAROLINA v. JOHN THOMAS HELMS

No. 96

(Filed 25 January 1974)

**1. Criminal Law § 5— bifurcated trial — insanity — guilt**

The sound exercise of the trial court's discretion should result in a bifurcated trial only when a defendant shows that he has a substantial insanity defense and a substantial defense on the merits to any element of the charge, either of which would be prejudiced by simultaneous presentation with the other.

**2. Criminal Law § 5— denial of bifurcated trial — insanity — guilt**

The trial court in a rape and kidnapping case did not abuse its discretion in the denial of defendant's motion for a bifurcated trial— one jury to pass upon the question of his sanity or insanity and a separate jury to pass upon the issue of his guilt—made on the ground that evidence of defendant's prior deviant sexual misconduct, necessarily offered to explain his mental condition, tended to prejudice the jury on the question of his guilt or innocence where the record reveals no substantial defense on the merits which could have been prejudiced by simultaneous presentation with his defense of insanity.

**3. Criminal Law §§ 5, 63— insanity — M'Naghten rule — irresistible impulse doctrine**

The trial court in a rape and kidnapping case did not err in excluding expert psychiatric testimony to the effect that defendant lacked substantial capacity to conform his conduct to the requirements of the law by reason of mental defect or disease and in refusing to give special instructions which would mandate an acquittal if the jury found that defendant's actions resulted from an irresistible impulse since the ability of the accused to distinguish right from wrong at the time and with respect to the matter under investigation remains the test of criminal responsibility in this State.

DEFENDANT appeals from judgment of *Friday, J.,* 29 May 1973 Session, GASTON Superior Court.

Defendant was tried upon separate bills of indictment, proper in form, charging him with (1) kidnapping and (2) raping Marcia Dawn Adams on 9 October 1972 in Gaston County.

Upon the call of the case defendant filed a written motion for a bifurcated trial—one jury to pass upon the question of his sanity or insanity and a separate jury to pass upon the issue of his guilt or innocence. This motion was denied and constitutes the basis of one assignment of error on this appeal.

The State's evidence tends to show that on 9 October 1972 Marcia Dawn Adams, sixteen years of age, was a student at Hunter Huss High School in Gastonia. At 10:30 a.m. that morning she called her mother to come after her because she was not feeling well. To await the arrival of her mother, she went outside and sat down on a bank beside the street. She had been there only a few minutes when an old white car passed along the street in front of her, went into the parking lot, turned around and came back, stopping in front of her. The driver, later identified as defendant, pointed a pistol at her and ordered her into the car.

Miss Adams entered the car from the passenger side and started crying. Defendant told her if she did what he wanted her to do "and played it cool" that she would be all right. They drove through the city park once or twice and then to the Crowder's Mountain area and stopped. Defendant instructed Miss Adams to get out of the car and enter a wooded area near the road. He followed her with pistol in hand. At a spot not visible from the road, defendant instructed Miss Adams to stop, remove her clothing and lie on the ground. She obeyed the instructions and defendant raped her.

After raping Miss Adams, defendant instructed her to put on her clothes, which she did, and they returned to the car. She requested defendant to take her to the intersection of Belmar and Linwood Streets in Gastonia, a point not far from her home. On the way, in response to defendant's questions, Miss Adams said she would not inform the police and would not tell her mother about the rape. She left defendant's car at the chosen intersection and shortly thereafter accepted a ride from Ricky Strout, a passing motorist who observed her crying. Mr. Strout took her home and then to Hunter Huss School in search of her mother. Upon arrival at the school, she found her mother and told her what had occurred. The police were called and the incident reported.

From school Miss Adams was carried to a doctor's office where a pelvic examination revealed motile sperm in her vagina.

Four days later, on Friday, 13 October 1972, Miss Adams accompanied officers to a dwelling on Rural Paved Road 1307 where John Thomas Helms lived with his wife and there observed a Ford automobile which she identified as the car in

which she was kidnapped. This car was identified as the property of John Thomas Helms.

Following defendant's arrest, Miss Adams positively identified him as her assailant.

Defendant did not testify as a witness in his own behalf but offered the testimony of other witnesses narrated below.

C. T. Fuller, an officer with the Gaston Rural Police Department, testified that on 13 October 1972 he saw defendant near Ashbrook High School driving a yellow Opel GT in the high school parking lot; that Helms appeared to put something down beside the seat when he saw Officer Fuller; that he stopped defendant and found a pistol, State's Exhibit 2, between the seats; that defendant got out of his car and asked the officer what was wrong; that defendant produced his driver's license upon request without any trouble but failed to produce a registration card; that defendant said nothing else and Officer Fuller took him to the police station; that although defendant had no odor of alcohol about him, he appeared to be in a daze and under the influence of something; that he perspired profusely and seemed quite nervous.

Captain Bert Homesley of the Gaston Rural Police Department testified that he saw defendant on 13 October 1972 at the police station and gave him the *Miranda* warnings several times to make sure defendant understood his rights; that defendant never spoke on this occasion but gave his answers by nodding his head, indicating yes or no; that in that fashion he indicated he was not under the influence of alcohol or drugs, that he understood his rights, and that he did not want a lawyer present at a lineup which was conducted and at which Miss Adams again identified him as her assailant; that he looked then "as he looks now. He didn't say anything just sat there like he is now. He was not moving around during the whole 45 minutes. I didn't notice anything else unusual about him."

Dr. Eugene D. Maloney, who was admitted to be a specialist and expert in the field of psychiatry, testified that he first saw defendant in jail on 17 October 1972 and examined him. Defendant was shaking, trembling, sitting on the edge of his bunk, holding his head and rubbing his forehead. At times he would cry, at times he staggered, at times he was sleepy, slow moving, slow talking, slow thinking. He talked in a very low voice and

his answers to questions were short and incomplete. On 8 February 1973 Dr. Maloney again saw defendant in jail and found him a little better dressed and a little better able to answer questions but more depressed. On 16 March 1973 defendant was seen by Dr. Maloney in his office at which time defendant's actions were "somewhat inappropriate"—for example, "he would very frequently get out of the chair and squat in the floor saying he felt more comfortable sitting in the floor." Finally, Dr. Maloney saw defendant on 25 May 1973 at which time he was more able to answer questions, more talkative, a little more spontaneous. In answer to a hypothetical question, Dr. Maloney testified that in his opinion defendant "knows the nature and consequences of his act, and he has the mental facilities to know the difference between right and wrong; but now, we are going to fall into a gray area. While he has the mental ability to know this, he simply feels that it's not wrong to rape people—to rape women. We never did get into the diagnosis because things changed as time went by. His original diagnosis was sociopathic personality—one that doesn't profit from experience—depressive reaction. Well, that was the first interview; and the next interview I got into his sexual history and sexual behavior since being a child; and so, as an additional diagnosis, I would add sexual deviation and variety of types under this. Later on while in the jail, I felt that his depression increased to the point of just about going off the deep end; and in my opinion, he did go off the deep end while in jail, called—or what I would call a psychotic depressive reaction. Later, he was sent to Dix and given some treatment for this; and, of course, came back in good condition except on his last examination which I felt he could stand trial. I felt that he knew he was able—had the mental facility but a deep down belief that it was simply all right to rape women period. He felt it was morally all right to rape women and in his opinion it was legally all right to rape women. It was simply that the laws were wrong."

The following answer to a hypothetical question put to Dr. Maloney was excluded: "I feel that John Thomas Helms was suffering from a mental disease or defect that did affect his ability to foresee the rightfulness or wrongfulness of the situation. I am further of the opinion that because of this mental disease or defect he lacked substantial capacity to conform his conduct to the requirements of law. I do not believe he could conform to the law. Although then he had the capacity to know

that something was wrong, because of this defect, he lacked the capacity to conform his conduct to that law which he knew was wrong. Even in the strictest sense he had the mental capacity to appreciate this, but as a result of this mental reasoning or defective judgment that gave him defective reasoning, then it would give him the inability to conform. I have an opinion that in the future he will not be able to conform his conduct to the requirements of the law. This defect has been existing for some time in controlling his ability to conform his conduct and will continue to do so. John Thomas Helms had the capacity to distinguish between right and wrong as to whether or not it was right and wrong to rape someone and knew the law that he wasn't supposed to rape but he had another disease in that he thought the law was wrong and he had a right to do it." Defendant assigns exclusion of this evidence as error.

Christine Helms, defendant's wife, testified that her husband received a dishonorable discharge from the United States Army; that she had observed his behavior around teenage girls; that when he saw girls "with short dresses on or short shorts or something like that, he seemed to think they were asking to be assaulted or something. He just seemed like he thought they were asking him to stop and pick them up. He did this on more than one occasion. He acted on these occasions like his mind was wandering."

Mrs. Helms stated on cross-examination that she and her husband owned the white Ford in question and also the Opel that defendant was driving at the time of his arrest.

The jury found defendant guilty of kidnapping and guilty of rape. He was sentenced to a term of not less than twenty nor more than twenty-five years for kidnapping and to life imprisonment for rape, to run consecutively. Defendant appealed to this Court assigning errors discussed in the opinion.

*Robert Morgan, Attorney General; Edwin M. Speas, Jr., Assistant Attorney General, for the State of North Carolina.*

*R. C. Powell, attorney for defendant appellant.*

HUSKINS, Justice.

Defendant assigns as error the denial of his motion for a bifurcated trial. He contends that evidence of his prior deviant

sexual misconduct, necessarily offered to explain his mental condition, tended to prejudice the jury on the question of his guilt or innocence.

[1, 2]  Bifurcation rests within the sound discretion of the trial judge. Exercise of that discretion is not reviewable absent abuse of it. *State v. Spence,* 271 N.C. 23, 155 S.E. 2d 802, rev'd on other grounds, 392 U.S. 649, 20 L.Ed. 2d 1350, 88 S.Ct. 2290 (1967). Other jurisdictions hold that the sound exercise of the trial court's discretion should result in a bifurcated trial *only* when "a defendant shows that he has a substantial insanity defense and a substantial defense on the merits to any element of the charge, either of which would be prejudiced by simultaneous presentation with the other." *Contee v. United States,* 410 F. 2d 249 (D.C. Cir. 1969). Here, the record reveals no substantial defense on the merits which could have been prejudiced. No abuse of discretion has been shown. This assignment of error is overruled.

[3]  Defendant's remaining assignments of error relate to the exclusion of expert psychiatric testimony to the effect that defendant lacked substantial capacity to conform his conduct to the requirements of the law by reason of mental defect or disease, and to the refusal of the trial judge to give special instructions which would mandate an acquittal if the jury found that defendant's actions resulted from an irresistible impulse.

In substance, these assignments seek abandonment in this jurisdiction of the M'Naghten rule and adoption of the Model Penal Code's "irresistible impulse doctrine." Defendant argues that the M'Naghten rule violates the prohibition against cruel and unusual punishment proscribed by the Eighth Amendment to the Federal Constitution in that it requires the punishment of persons who would, under other tests of insanity, be committed to mental institutions for treatment rather than imprisoned for crime. We find this argument unpersuasive.

The M'Naghten rule—the ability of the accused to distinguish right from wrong at the time and with respect to the matter under investigation—has been recognized by this Court as the test of criminal responsibility for more than one hundred years. *State v. Humphrey,* 283 N.C. 570, 196 S.E. 2d 516 (1973) ; *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969) ; *State v. Spence,* 271 N.C. 23, 155 S.E. 2d 802, rev'd on other grounds, 392 U.S. 649, 20 L.Ed. 2d 1350, 88 S.Ct. 2290 (1967) ;

*State v. Creech,* 229 N.C. 662, 51 S.E. 2d 348 (1949) ; *State v. Potts,* 100 N.C. 457, 6 S.E. 657 (1888) ; *State v. Brandon,* 53 N.C. 463 (1862).

In *Leland v. Oregon,* 343 U.S. 790, 96 L.Ed. 1302, 72 S.Ct. 1002 (1952), the United States Supreme Court said:

> "Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in *M'Naghten's Case,* but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.' "

Chief Justice Stacy, speaking for this Court in *State v. Creech, supra,* said:

> "We are aware of the criticism of this standard by some psychiatrists and others. Still, the critics have offered nothing better. It has the merit of being well established, practical and so plain 'that he may run that readeth it.' Hab. 2:2. Moreover, it should be remembered that the criminal law applies equally to all sorts and conditions of people. It ought to be sufficiently clear to be understood by the ordinary citizen."

Thus, the M'Naghten rule is constitutionally sound; and our adherence to it is based on reason and common sense. "Insanity is incapacity, from disease of the mind, *to know the nature and quality* of one's act or *to distinguish between right and wrong* in relation thereto." *State v. Mercer, supra.* Under the law of this State there is no halfway house on the road to insanity which affords sanctuary to those who know the right and still the wrong pursue. "The law does not recognize any moral power compelling one to do what he knows is wrong. . . . There are many appetites and passions which by long indulgence acquire a mastery over men more or less strong. Some persons,

indeed, deem themselves incapable of exerting strength of will sufficient to arrest their rule, speak of them as irresistible, and impotently continue under their dominion; but the law is far from excusing criminal acts committed under the impulse of such passions." *State v. Brandon,* 53 N.C. 463 (1862).

All the evidence tends to show that defendant knew it was wrong and a violation of the law to kidnap and rape. He was therefore answerable for his conduct.

For the reasons stated we adhere to the M'Naghten rule as the test of criminal responsibility in this State. The trial judge correctly excluded the psychiatric testimony and correctly refused to give the special instructions requested by defendant. Assignments of error based thereon are overruled.

The record in this case reveals no prejudicial error. The judgments imposed must therefore be upheld.

No error.