STATE OF NORTH CAROLINA v. JAMES PERRY POTTER

No. 60

(Filed 15 May 1974)

1. **Criminal Law §§ 5, 29— mental capacity — defendant under medication — synthetic sanity**

     Though defendant was taking a prescribed medication at the time of his trial to control the psychotic symptoms of a paranoid schizophrenic, he was nevertheless capable of understanding the nature and object of the proceedings against him and assisting in his own defense, and defendant's assertion that he was incompetent to stand trial because his mental capacity was one of "synthetic sanity" is without merit.

2. **Criminal Law §§ 29, 63— sanity of defendant — test — evidence as to sanity**

     Diagnosis of a defendant's mental condition or disease as "paranoid schizophrenia," standing alone, does not exempt him from legal responsibility for criminal conduct; rather, he is exempt only if insane by reason of his incapacity to know the nature and quality of his acts or to distinguish between right and wrong in relation thereto, and expert testimony in respect of defendant's mental condition or disease is for consideration by the jury along with all other evidence pertinent to the issue raised by the plea of insanity.

3. **Robbery § 6— robbery of two employees — one offense — one judgment**

     When the lives of all employees in a store are threatened and endangered by the use or threatened use of a firearm incident to the theft of their employer's money or property, but no employee is injured or killed and no employee's personal property is taken, a single robbery with firearms is committed; therefore, where defendant was convicted of robbing two employees of the same store during one holdup, and defendant took only money belonging to the employer, two judgments imposing prison sentences of not less than twenty nor more than twenty-five years with the sentences to run consecutively are to be considered as if a single judgment had been entered.

     Justice HUSKINS dissenting.

     Justice BRANCH joins in the dissenting opinion.

ON *certiorari,* granted on motion of defendant, to review the decision of the Court of Appeals, 20 N.C. App. 292, 201 S.E. 2d 205, which found "No error" in the trial before *Judge Lanier,* and a jury, at the 26 March 1973 Session of WAYNE County Superior Court.

In indictment #73CR535, defendant was charged with the armed robbery of Dallas Mike Hall on 29 December 1972, in which $265.00 was taken from his "presence, person, place of

business, and residence. . . . " In indictment #73CR3557, defendant was charged with the armed robbery of Jack Harrell on 29 December 1972, in which $265.00 was taken from his "presence, person, place of business, and residence. . . . " The two cases were consolidated for trial.

When arrested, defendant was first confined in the Wake County Jail. He was removed to the Wayne County Jail on 12 January 1973.

Upon petition filed 5 February, 1973 by J. Thomas Brown, Jr., Esquire, defendant's court-appointed counsel, Judge Perry Martin ordered that defendant "be committed to Cherry Hospital for not more than 60 days for observation and treatment," and that the Superintendent of Cherry Hospital report his findings to the Clerk of Superior Court of Wayne County.

After the reading of the indictments and the selection of the jury, defendant's counsel "moved the Court to inquire into whether or not the defendant is capable of pleading to the indictments and conducting a rational defense and cooperating with counsel in defense of the charges which have been filed against him." The requested inquiry was conducted by the court in the absence of the previously selected jurors.

The prosecuting attorney offered in evidence a report dated 9 March 1973 signed by Eugene V. Maynard, M.D., Regional Director of Forensic Psychiatry at Cherry Hospital. The report indicates that it reflects the findings and conclusions reached at a conference of "the staff" on 6 March 1973.

The report contains data set forth at length under the following captions: (1) Statistical Data; (2) Past and Social History, as Related by Defendant; (3) Mental Status on Admission; (4) Hospital Course; (5) Physical Examination; and (6) Laboratory Studies.

The report concludes as follows:

"DIAGNOSIS: Schizophrenia, Paranoid Type, In Remission.

"RECOMMENDATIONS: The examination, observation and testing performed in this hospital reveal evidence of a serious mental disturbance known as schizophrenia, paranoid type; however, it is the opinion of this staff that the illness is in such a state of remission as to not interfere with the defendant's competency to stand trial to the charge of armed robbery. Mr. Potter

has demonstrated the capacity to comprehend his position and to understand the nature and object of the proceedings against him. He has the capacity to conduct his defense in a rational manner and to cooperate with his counsel to the end that any available defense may be interposed. It is the opinion of this staff that Mr. Potter should be returned to the court inasmuch as he is competent to plead to the charge against him.

"It is respectfully suggested that Mr. Potter continue on his present medications of Haldol 15 mg three times a day and Artane 5 mg twice a day. He should continue to receive follow-up care and treatment of his mental illness by the appropriate mental health facility relative to the disposition of his charges."

Dr. Maynard was called as a witness by defendant's counsel and examined extensively on direct and cross-examination.

The report and testimony of Dr. Maynard constituted the only evidence before Judge Lanier bearing upon whether defendant was competent to stand trial.

We quote below what appears in the record concerning Judge Lanier's findings that defendant was competent to stand trial.

"COURT: According to the report, the people on the staff say that his condition is in such a state of remission as to not interfere with the defendant's competency to stand trial on the charge of armed robbery; that Mr. Potter has demonstrated the capacity to comprehend his position and to understand the nature and object of the proceedings against him. He has the capacity to conduct his defense in a rational manner and to cooperate with his counsel to the end that any available defense may be interposed. Now that's the opinion of the staff. He was committed under the laws of the State of North Carolina to determine whether he was competent to stand trial. From the evidence, from the reports, he is competent to stand trial. . . .

"The Court finds as a fact that the defendant under order of the Court pursuant to General Statutes 122-91 was committed to Cherry Hospital, Goldsboro, North Carolina, to be evaluated regarding his competency to stand trial to the charges against him on the 6th day of February, 1973; that he was released the 27th day of March, 1973; that he was treated throughout his stay in Cherry Hospital; that he is still under medication; that his mental illness is now in a remission; that the defendant is

State v. Potter

mentally competent at this time in all respects to stand trial to the charges against him. It is hereby ordered that the trial proceed."

Thereupon, defendant pleaded not guilty to the indictments and the jurors, who had been previously selected, were recalled from the jury room and sworn and empaneled to try the cases.

Uncontradicted evidence offered by the State tends to show the following. The defendant entered the Convenient Food Market about 8:00 p.m. on 29 December 1972. Hall and Harrell (referred to in the evidence as Horrell), employees of the Food Market, were the only persons in the store when defendant entered. Hall was standing at the counter behind the two cash registers. Harrell was working at a food freezer some twenty-five feet away. Defendant approached Hall and asked for a job, stating that he wanted work as a cashier. Hall advised him there was no vacancy at this store and made suggestions as to where defendant might find a job. During this conversation, Harrell became engaged in a telephone conversation, the telephone being "about six feet from the registers."

When Harrell hung up the telephone, "that's when the defendant started." He drew a revolver from his coat and said, "Freeze, I want all the money." Defendant told Harrell "to get over there," and stated "that he wanted all the money in a brown paper bag and no checks." Hall placed the cash from one register (referred to as No. 1) in a brown paper bag and handed it to defendant. Defendant placed this money in his left coat pocket and walked "less than six feet" to the other cash register (referred to as No. 2) where Harrell was standing. Harrell got the cash from register No. 2 and gave it to defendant. When he came over to cash register No. 2 to get the money, defendant told Harrell: "Old man this gun will kill you," and "[y]ou can call the police if you want to," but "[d]on't follow me or I'll kill you." Defendant put the money from cash register No. 2 in his left coat pocket and ran out the front door. The money taken from both registers totaled approximately $265.00.

Defendant had been in the store at least three or four minutes before he made known his purpose was robbery. Hall testified that defendant appeared to be in his right mind. Harrell testified that defendant appeared to be sane. Both Hall and Harrell testified that they turned the money over to defendant because they were put in fear by defendant's demands and his display of the revolver.

Detective Sergeant R. A. Stocks, of the Goldsboro Police Department, testified that he, along with Captain Floares, brought defendant from the Wake County Jail to the Wayne County Jail on 12 January 1973; that he had known defendant "probably 25 years"; that he observed defendant for approximately two hours before their arrival at the Wayne County Jail; that their conversation was general in nature and did not include any discussion of this case; that after their arrival in Goldsboro, defendant was advised of his constitutional rights, at which time he stated "he wanted a lawyer" and thereupon "all questioning ceased"; that, in his opinion, defendant "was in his right mind" and "was acting like a man in his right mind."

Defendant did not testify. His evidence consisted of testimony of Dr. Maynard; of Robert Potter, defendant's father; and of Ann Bass.

The testimony of Dr. Maynard, summarized except when quoted, is narrated below.

He first saw defendant on 6 February 1973 at Cherry Hospital. His diagnosis of defendant's condition was "paranoid schizophrenia," with a secondary diagnosis of "psychopathic," that is, "anti-social," personality. He testified: "A layman's definition of paranoid schizophrenia would be as follows: Schizophrenia is a mental disease of psychotic depth which is manifested by disorders of behavior, thinking and feeling oftentimes manifested by hallucinations and delusional thinking." Paranoia is usually manifested by feelings or ideas of persecution or grandiosity and by "false ideas of reference."

The first manifestation of delusional thinking observed by Maynard occurred when defendant declared he was "the reincarnation of Jesse James," and that he had robbed the rich and given to the poor as (he thinks) Jesse James did. Maynard testified that defendant demonstrated "paranoid ideation in his feelings towards people who have worldly goods and the poor people, including himself, having been deprived of them all his life." However, he observed that defendant "remembers very well stealing from his own parents when he was a child."

Maynard testified that defendant's idea that he was "the reincarnation of Jesse James," was a manifestation of grandiosity and "was apparently a very important thing to him." In Maynard's opinion, the adoption by defendant of the idea that

he was the reincarnation of Jesse James "would give him the idea of [sic] what he was doing was right when in actuality he knew he was doing wrong."

Maynard testified that "[e]very schizophrenic is an individual," and that, in his opinion, "some clearly know right from wrong and . . . some don't." He testified that in his opinion defendant did know right from wrong; that he formed this opinion on February 19th, about thirteen days after he started treating defendant. He further testified that on February 19th he did not think defendant had reached a sufficient level of competency to be brought back to court to stand trial.

(At this point in Maynard's testimony, defendant "threw a Bible at the witness," and exclaimed: "I told you I'm not crazy. Let me get out before I" (end of statement). The court, after excusing the jury, asked defendant: "Do you think that you can carry on without disrupting the Court?" Defendant answered: "Yes, sir, I don't know what made me do it." Thereupon, the court asked: "Well, do you promise to do that?" Defendant answered: "Yes, sir, I just slipped." Thereupon, the jury was brought in and the testimony of Maynard continued.)

Maynard testified that defendant related to him numerous previous encounters with the law which resulted in his confinement in training school, jails, prisons and mental institutions.

Maynard testified that defendant recounted "terrific tales concerning various hold-ups and things that he ha[d] imagined," and that "[a]pparently this young man has led a life of crime and anti-social behavior since his very early years." Maynard further testified that defendant stated that "he hears the word of his mother who has been dead some time and also hears the voice of God." He further testified that defendant said "he had sold his soul to the devil in 1963 for eternal life" and that there "were directions from the devil giving him instructions as to what he should do. . . ."

Maynard testified that on February 19th defendant made the statement "that he really didn't believe that he was the reincarnation of Jesse James," and that if he continued to believe it "he would probably be in Cherry Hospital for the rest of his life," and "he didn't want to"; but later he repeated his earlier statement that "he really believed that he was the reincarnation of Jesse James and that he had sold his soul to the devil in 1963 for eternal life."

Maynard further testified that he knew defendant had been confined in mental hospitals on three occasions; that on each of these occasions defendant had been diagnosed as "without psychosis" and as "anti-social personality"; and that his records disclose that defendant had been confined in Cherry Hospital in December of 1969 and was found "to have a personality disorder not of psychotic level."

Maynard testified that "[p]sychopathic behavior is not considered a mental disease, but rather a personality disorder"; that "[a]nti-social personalities can function in society" and are found "in every walk of life"; and that "[y]ou do not have a much more serious problem with psychopathic behavior and schizophrenia if the schizophrenia is in remission."

Maynard was then asked and answered the following question:

"Q. Doctor, based on your two months' examination, roughly two months' examination and conferences with Mr. Potter, based on your knowledge of his condition, mental condition or conditions, do you have an opinion as to whether or not on December 29th, 1972 while not on Haldol, the defendant James Perry Potter knew the difference between right and wrong?

"A. Yes, I do.

"Q. What is that opinion?

"A. That he did know right from wrong."

It was stipulated that Dr. Maynard "is a medical expert practicing in the field of psychiatry."

The testimony of Dr. Maynard narrated above was elicited when he was questioned on direct examination by counsel for defendant.

On cross-examination by the solicitor, Maynard testified: "Hearing voices is generally called auditory hallucination." In Maynard's opinion, "normal people have these." Maynard had seen "scars from defendant's cutting himself" and knew defendant had been transferred from State Prison to Dorothea Dix Hospital "because of self-mutilation oftentimes done with a scraped off toothbrush handle." In Maynard's opinion, these episodes of self-inflicted mutilations were designed "[t]o manipulate himself from a prison cell to a hospital."

Maynard testified that in his opinion the anxiety connected with defendant's arrest and confinement prior to his admission to Cherry Hospital "could cause an acute episode of schizophrenia, paranoid type." Based upon his observations and discussions with defendant in Cherry Hospital, Maynard testified that "the defendant displayed the ability to react appropriately to the circumstances in which he found himself at Cherry Hospital"; that "the defendant displayed the ability to coordinate his actions such as eating, smoking, and drinking"; that "he displayed the ability to give responsive answers to your questions and to ask appropriate questions"; that he "displayed the ability to conform to the routine of the hospital and to the routine that was expected of him"; and that the defendant had a good memory "of historical facts, past and present." Maynard testified that defendant had never shown any hostility to him prior to his outburst at trial.

Robert Potter testified that, when "about 7 years old," defendant "fell out of a tree and fell on his head and broke his arm"; that defendant "had a big knot on his head and finally got over it but has never acted right since"; that defendant lived in his home until he was "about 13," at which time "he was sent off to a training school"; that defendant is now "about 27 years old"; that defendant has been married twice; that defendant hadn't stayed in his home "in a year or more"; and that he didn't know "what [his] son [had] been like in over a year."

On direct examination, Robert Potter testified that, based on his association with defendant throughout his lifetime, it was his opinion that defendant was "insane." On cross-examination, when asked what he had in mind as to the legal meaning of the word "insane," he testified as follows: "I define being crazy as insane. I do this by the way a person acts. I mean by insane you can look at his arms there where he sliced himself when he had fits and had spells. He cut himself all to pieces and tried to hang himself right down here in jail one time and being living around him and being with him in his early years, I could tell he was crazy. I do not believe my son knows the difference between right and wrong."

Robert Potter further testified that he had spoken to defendant the morning of the day he testified, at which time they did not talk about "this case" and that defendant did not "ask [him] to testify for [defendant]."

Ann Bass, 19, an adopted daughter of Robert Potter, testified she had known defendant since she was 11; that she had seen him "about 7 or 8 times off and on"; that she had been "in his company and had an opportunity to observe him"; that defendant "does not act like a person who is in his right mind"; and that, in her opinion, defendant is insane. She testified that in her presence defendant talked "about killing himself and killing other people," and that on one occasion defendant cut himself on his arm "at [her] daddy's house" and "sewed it up himself."

On cross-examination, Ann Bass testified that the defendant talked and acted "foolish," and that she thought "that anybody that writes checks and robs people is bound to be crazy." She further testified she had seen defendant and had talked with him "just a few minutes" on the morning of her testimony, and on that occasion defendant "did not tell [her] anything about testifying."

In rebuttal, the State offered the testimony of Harrison and Minshew, the employees of the Sheriff's Department who, on the day of the trial, were charged with the responsibility of bringing defendant to the courtroom. Each testified defendant was placed temporarily in the "bullpen," an area near the courtroom; that a person in the bullpen could see through the window in the front door persons in the hall leading from the courtroom to the bullpen; and that each was standing outside the bullpen, off from the door. Each testified that, about 9:30 a.m., Robert Potter and Mrs. Bass were in the hall; that, when they approached the front door of the bullpen, defendant yelled or called out, "Daddy, you've got to tell them I'm crazy." Harrison also testified that defendant asked his father (1) if he were nervous and (2) if he had seen his lawyer that morning. Each testified that he heard, "through the door," what defendant had said.

In #73CR535 (Hall case), the court pronounced judgment which imposed a prison sentence of not less than twenty (20) nor more than twenty-five (25) years. In #73CR3557 (Harrell case), the court pronounced judgment which imposed a prison sentence of not less than twenty (20) nor more than twenty-five (25) years, this sentence to commence upon expiration of the sentence in #73CR535. Defendant excepted and appealed to the Court of Appeals.

*Attorney General Robert Morgan, Assistant Attorney General Myron C. Banks and Associate Attorney Norman L. Sloan for the State.*

*Sasser, Duke and Brown by J. Thomas Brown, Jr., for defendant appellant.*

*James Perry Potter in propria persona.*

BOBBITT, Chief Justice.

We consider first the assignment of error which challenges the court's ruling that defendant when arraigned and tried had sufficient mental capacity to plead to the indictments and to conduct a rational defense.

"In determining a defendant's capacity to stand trial, the test is whether he has the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed." 21 Am. Jur. 2d, Criminal Law § 63 (1965); *accord, State v. Propst,* 274 N.C. 62, 70, 161 S.E. 2d 560, 566 (1968); *State v. Jones,* 278 N.C. 259, 266, 179 S.E. 2d 433, 438 (1971); 2 Strong, N. C. Index 2d, Criminal Law § 29.

The uncontradicted evidence is to the effect that, when tested by the rule stated above, defendant had sufficient mental capacity to plead to the indictments and conduct a rational defense. Assuming, *arguendo,* he had such mental capacity at the time of his arraignment and trial, defendant contends it was dependent upon his continued use of prescribed medication to control the psychotic symptoms of a paranoid schizophrenic. Defendant refers to mental capacity under these circumstances as "synthetic sanity" and asserts such a person is mentally incapable of pleading to the indictment and conducting a rational defense.

The Supreme Court of Louisiana considered and rejected the precise contention now made by defendant. The Louisiana statute provided: "Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." In *State v. Plaisance,* 252 La. 212, 210 So. 2d 323 (1968), and in *State v. Hampton,* 253 La. 399, 218 So. 2d 311 (1969), the defendant asserted he was mentally

incapable of pleading and of standing trial in that his "sanity" was "synthetic" because of circumstances closely analogous to those disclosed by the evidence in the present case. Speaking for the Supreme Court of Louisiana, Justice (now Chief Justice) Sanders, in *Hampton,* said:

"The test of present insanity under the above Article is whether the defendant *presently* lacks the capacity to understand the proceedings or to assist in the defense. A defendant who is capable of understanding the nature and object of the proceedings and assisting rationally in the defense is competent to stand trial. [Citations omitted.]

"The members of the sanity commission were the only witnesses to testify at the hearing. In their opinion, defendant can understand the nature of the proceedings and assist in her defense. The record contains no evidence to the contrary. The psychotic symptoms are in remission. That this condition has resulted from the use of a prescribed tranquilizing medication is of no legal consequence. Under the codal test, the court looks to the condition only. It does not look beyond existing competency and erase improvement produced by medical science." *State v. Hampton, supra,* at 403, 218 So. 2d at 312. *Cf. State v. Hancock,* 247 Or. 21, 426 P. 2d 872 (1967); *State v. Rand,* 20 Ohio Misc. 98, 247 N.E. 2d 342 (1969).

[1]   The sole question now under consideration is whether defendant was capable of pleading and standing trial at the time of his arraignment and trial. All the evidence tends to show he had sufficient mental capacity at that time to meet the prescribed test. Hence, the court's ruling was proper.

We consider now the assignment of error which challenges the court's denial of defendant's motion at the conclusion of all the evidence for judgment as in case of nonsuit. Defendant's position is based largely on the fact that his mental condition was diagnosed "paranoid schizophrenia" and on Dr. Maynard's testimony (on *voir dire)* that he knew of no cure for schizophrenia or paranoia, although both could be brought into remission by medication. The contention seems to be that a person who has the mental condition or disease diagnosed as "paranoid schizophrenia" lacks legal responsibility for conduct which constitutes a violation of the criminal law when committed by a "normal" person and therefore is not guilty as a matter of law.

---

State v. Potter

---

In view of the recurrence of trials in which the mental condition of the defendant is diagnosed as "schizophrenia" or "paranoia" or "paranoid schizophrenia," we have set forth the evidence in greater detail to indicate the legal problems these cases present to the jury and to the court.

Defendant's contention that he is exempt from criminal responsibility as a matter of law by reason of mental disease ignores the well established legal test for determining whether a person is exempt from criminal responsibility by reason of insanity. In *State v. Swink,* 229 N.C. 123, 125, 47 S.E. 2d 852, 853 (1948), Ervin, J., restated the rule in this jurisdiction as follows: "[A]n accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he is doing, or, if he does know this, incapable of distinguishing between right and wrong in relation to such act." Subsequent decisions in accord therewith include the following: *State v. Creech,* 229 N.C. 662, 674, 51 S.E. 2d 348, 357 (1949) ; *State v. Spence,* 271 N.C. 23, 38, 155 S.E. 2d 802, 814 (1967) ; *State v. Jones,* 278 N.C. 259, 266, 179 S.E. 2d 433, 438 (1971) ; *State v. Humphrey,* 283 N.C. 570, 573-74, 196 S.E. 2d 516, 518-19 (1973) ; *State v. Helms,* 284 N.C. 508, 513, 201 S.E. 2d 850, 853-54 (1974). Insanity is incapacity, from disease of the mind, *to know the nature and quality* of one's act or *to distinguish between right and wrong* in relation thereto. *State v. Mercer,* 275 N.C. 108, 117, 165 S.E. 2d 328, 335 (1969) ; *State v. Atkinson,* 275 N.C. 288, 313-14, 167 S.E. 2d 241, 256 (1969) ; 2 Strong's N. C. Index 2d, Criminal Law § 5.

When a defendant in a criminal case pleads insanity, the applicable rule with reference to the burden of proof on this issue has been well stated as follows: "Since soundness of mind is the natural and normal condition of men, everyone is presumed to be sane until the contrary is made to appear. This presumption of sanity applies to persons charged with crime, but it is rebuttable. [Citations omitted.] These considerations give rise to the firmly established rule that the burden of proof upon a plea of insanity in a criminal case rests upon the accused who sets it up. But he is not obliged to establish such plea beyond a reasonable doubt. He is merely required to prove his insanity to the satisfaction of the jury. [Citations omitted.]" *State v. Swink, supra,* at 125, 47 S.E. 2d at 853.

Dr. Maynard testified that "every schizophrenic is an individual"; that "some clearly know right from wrong and . . . some don't"; and that, in his opinion, defendant knew the difference between right and wrong on 29 December 1972, the date of the alleged crime(s), without regard to whether he was then under medication. However, the opinion of an expert psychiatrist is not conclusive. As noted in *In re Tew*, 280 N.C. 612, 619, 187 S.E. 2d 13, 18 (1972) : "Psychiatry is not an exact science. . . ." Here, in addition to Dr. Maynard's expert testimony, the evidence includes testimony of significant facts bearing upon whether defendant was criminally responsible on 29 December 1972.

The testimony of Hall and Harrell tends to portray defendant as a somewhat nervous person; that defendant entered the store at night at a time when no one was there except the two cashiers; that he got his bearings while making inquiry and getting advice concerning a job; that he wanted all the cash but no checks; and that before walking out he warned the employee(s) of the store not to follow him. Their testimony tends to show a planned robbery, executed with finesse. In their opinion, defendant appeared to be in his right mind. There is no evidence that defendant had identified himself with Jesse James prior to his entering Cherry Hospital on 6 February 1973. The facts recited by him to Dr. Maynard do not point to any incident in which he contributed to the poor the fruits of any robbery or theft he committed.

There was evidence tending to show that, when arrested and advised of his constitutional rights, defendant made no statement except to say that he wanted a lawyer; and that, when brought from Wake jail to Wayne jail, defendant appeared to be in his right mind.

There was evidence tending to show that on the morning of his trial he called upon his father to testify that he was crazy. Too, it might be inferred that his outburst at trial, considered in the light of the evidence that he had not previously shown hostility toward Maynard, was a calculated attempt to convey the impression that he was insane.

[2] We hold that diagnosis of a defendant's mental condition or disease as "paranoid schizophrenia," standing alone, does not exempt him from legal responsibility for criminal conduct; that he is exempt only if insane when tested by the rule stated above;

and that expert testimony in respect of his mental condition or disease is for consideration by the jury along with all other evidence pertinent to the issue raised by the plea of insanity.

The jury decided the issue of insanity against this defendant and found him guilty of the crime(s) charged in the indictments. The evidence fully warranted this verdict.

We have considered above the questions discussed by defendant in his supplemental brief. We refrain from discussing defendant's numerous assignments of error involving rulings on evidence and portions of the court's charge. Suffice to say, we approve the discussion and disposition thereof by Judge Baley in his opinion for the Court of Appeals. Hence, in accord with the Court of Appeals, we find no error with reference to the trial and verdicts.

Defendant has presented in this Court the contention that there was a single robbery and that the verdict(s) will support only one judgment for violation of G.S. 14-87. Although this question was not presented to or discussed by the Court of Appeals, consideration thereof is deemed appropriate since two judgments were pronounced, each imposing a prison sentence of not less than twenty nor more than twenty-five years, with provision that these sentences are to run consecutively.

Each indictment refers to the felonious taking of $265.00 on 29 December 1972. Neither alleges the ownership of the $265.00 to which it refers. Although the reading of the two indictments, *side by side,* leaves the impression each refers to the same $265.00, and that Hall and Harrell were robbed on the same occasion, neither refers to the other. Each indictment is complete.

The evidence discloses *all* of the $265.00 defendant obtained from Hall and Harrell belonged to the Food Market, their employer; and that, on the same occasion, and in the immediate presence of both, defendant, by the *threatened* use of a revolver, first obtained from Hall the cash in register No. 1 and immediately thereafter obtained from Harrell the cash in register No. 2. Although we find no evidence that defendant actually pointed the revolver at Hall or at Harrell, each was put in fear by defendant's threatened use of the revolver. Neither Hall nor Harrell was physically injured in any manner.

The evidence indicates that, when the robbery occurred, Hall had immediate charge of register No. 1 and Harrell had

immediate charge of register No. 2. However, the cash in both registers belonged to their employer. Both Hall and Harrell had custody thereof for their employer and the right to retain possession of *all* of it against robbery or theft.

In the light of the evidence, we hold that the verdicts have the same effect as if defendant had been found guilty after trial on a single indictment which charged the armed robbery of Hall and Harrell on 29 December 1972 in which $265.00 of the money of Food Market, their employer, had been taken from their persons and presence.

In *State v. Ballard*, 280 N.C. 479, 490, 186 S.E. 2d 372, 378 (1972), it is stated: "This case is of first impression in this jurisdiction involving a factual situation in which several employees of a store or other place of business are confronted by armed robbers and the life of each employee is endangered and threatened."

In *Ballard* the defendant was indicted for armed robbery involving the theft of $1501.17 of money belonging to the Great Atlantic and Pacific Tea Company, Inc. The first of two trials was on an indictment which charged, *inter alia*, that the robbery was committed by the use or threatened use of a .38-caliber pistol whereby the "life of Kane Parsons" was threatened and endangered and the $1501.17 was taken from the "person of Kane Parsons." Evidence disclosed that, although Parsons was an employee and in the store when the robbery occurred, the money was actually taken from his fellow employees, namely, Pat Britt and Nolan Smith. Nonsuit was allowed for variance between the indictment and proof. The second trial was upon a new indictment in all respects the same as the first except it alleged that the "lives of Pat Britt and Nolan Smith" were endangered and threatened, and the $1501.17 was taken "from the presence and person of Pat Britt and Nolan Smith."

Defendant was convicted and sentenced. This Court reversed, holding the nonsuit (acquittal) at the first trial precluded further prosecution.

In reaching this conclusion, the Court stated: "Clearly, both indictments and the evidence at both trials relate to what occurred on the same occasion, namely, the robbery of the A & P store on August 21, 1970, allegedly by defendant and two others, perpetrated by endangering and threatening the lives of all employees then present. The evidence, on which Ballard was

State v. Potter

convicted at the second trial, tended to show that Ballard was one of three men who entered the store about 8:55 p.m. on August 21, 1970; that Ballard and one of his confederates were armed with and displayed pistols; that, in the perpetration of their crime, the robbers commanded all employees to 'freeze' and for everybody to 'hit the floor,' which commands were promptly obeyed; that the employees in the store who heard and obeyed these commands included Pat Britt, Nolan Smith and Kane Parsons; that, although the money was removed from the immediate presence of Pat Britt and Nolan Smith, all employees in the store were confronted by the robbers and had responsibility for the custody and care of the employer's money; and that the life of each was threatened and would have been further endangered if any one or more of these employees had offered resistance to the armed robbers. We have concluded that this evidence was sufficient to have sustained the conviction of Ballard at the first trial and that the termination thereof in his favor supports his plea of double jeopardy.

"The duty of Kane Parsons to his employer would have required him to intervene to protect the property if he could have done so without further endangering his life. (Kane Parsons testified on *voir dire* that he was the assistant manager of this A & P store.) The fact that he happened to be farther from the property than Pat Britt and Nolan Smith when it was actually taken into possession by the robbers does not negate the fact it was taken from the presence of Parsons and all other employees then on duty in the store."

In *Ballard,* as in the case at hand, no physical injury was inflicted on any employee. Nor was any property taken except that of the employer.

[3] Although double jeopardy and collateral estoppel are not directly involved in the present case, the rationale of *Ballard* is that, when the lives of all employees in a store are threatened and endangered by the use or threatened use of a firearm incident to the theft of their employer's money or property, a single robbery with firearms is committed.

We express no opinion as to factual situations in which, in addition to robbery, an employee is physically injured or killed, or to factual situations in which, in addition to the theft of the employer's money or property, the robber takes money or property of an employee or customer.

The foregoing leads to these conclusions: We find no error in the trial and uphold the verdicts. However, the two verdicts are to be considered the same as a single verdict of guilty of armed robbery. The judgments pronounced are to be considered as if a single judgment were pronounced which imposed a prison sentence of not less than twenty nor more than twenty-five years, subject to credit for time in jail prior to trial. The judgments are so modified.

The cause is remanded to the Court of Appeals with direction to remand to the Superior Court of Wayne County with direction to that court to withdraw its prior commitment(s) and issue a new commitment in conformity with this decision.

No error in trial.

Judgment modified and cause remanded.

Justice HUSKINS dissenting.

I respectfully dissent from that portion of the majority opinion which holds that only one armed robbery was committed.

G.S. 14-87 provides that any person who, (1) having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, (2) whereby the life of *a person* is endangered or threatened, (3) unlawfully takes or attempts to take personal property from another, (4) at any time either day or night, (5) shall be guilty of a felony.

The gist of the offense is the attempt to commit robbery, whether consummated or not, by the use or threatened use of firearms or other dangerous weapon. The force or intimidation occasioned by the use or threatened use of the weapon is the main element of the offense. In such case it is not necessary or material to describe accurately or prove the particular identity or value of the property, provided the indictment shows that the property was that of the person assaulted *or under his care,* and that such property is the subject of robbery and had some value. *State v. Owens,* 277 N.C. 697, 178 S.E. 2d 442 (1971). The offense is complete if there is either a taking or an attempt to take the personal property of another by the use or threatened use of firearms or other dangerous weapon. *State v. Evans,* 279 N.C. 447, 183 S.E. 2d 540 (1971).

We held in *State v. Waddell,* 279 N.C. 442, 183 S.E. 2d 644 (1971) that a variance, between the allegation in the indict-

ment that one person was the owner and in charge of the store from which the property was forcibly taken and the evidence which disclosed that another person owned the store, is not fatal to an indictment which contained all essential averments required by the statute.

In this Court, for the first time, defendant makes the contention that there was but a single robbery and that the verdicts in these cases will support only one judgment for violation of the armed robbery statute, G.S. 14-87. The question was not presented to the Court of Appeals; and since our function is to review decisions of that court for errors of law, the question is not properly before us. Even so, when considered on the merits it is my view that the evidence discloses the commission of two armed robberies on the occasion in question.

Defendant is charged in one indictment with the armed robbery of Dallas Mike Hall and in the other indictment with the armed robbery of Jack Harrell. The evidence discloses that on 29 December 1972 defendant entered a food market in Goldsboro armed with a revolver and by the threatened use of that weapon obtained from Dallas Mike Hall a sum of money in cash register number one which was under Hall's care. Immediately thereafter, and in like fashion, defendant obtained from Jack Harrell an additional sum of money in register number two which was under Harrell's care. Each of these men was put in fear by defendant's threatened use of the revolver. The fact that the cash in both registers belonged to the food market is immaterial. Two robberies were committed, the same as if the money taken had belonged individually to Hall and Harrell, since it is not necessary that ownership of the property be laid in any particular person in order to allege and prove the crime of armed robbery. *State v. Rogers*, 273 N.C. 208, 159 S.E. 2d 525 (1968). The State need only show that it was the property of the person assaulted, *or in his care,* and had some value. *State v. Mull*, 224 N.C. 574, 31 S.E. 2d 764 (1944). The fact that neither victim was injured is immaterial since the gist of the offense is the taking by force or putting in fear with the use or threatened use of a firearm or other dangerous weapon.

Apparently, the majority opinion holds that only one robbery is committed if a robber enters Belk's Department Store and with the use or threatened use of a firearm endangers the life of each Belk employee in charge of the various cash registers, going from register to register, and from floor to floor, and

with the threatened use of the gun obtains from each employee the money in the register under his or her care. This is strange law to which I do not subscribe. I therefore respectfully dissent from this aspect of the majority opinion and vote to affirm the decision of the Court of Appeals.

Justice BRANCH joins in this dissenting opinion.